THE CITY OF PONTIAC, Plaintiff-Appellant, *v.* STEVEN J. MASON *et al.*,
Defendants-Appellees.

Fourth District   No. 13772

Opinion filed May 23, 1977.—Rehearing denied August 4, 1977.

Vicars, Fuhr & Caughey, of Pontiac (Robert R. Caughey and Edward J. Legner, of counsel), for appellant.

Thompson & Strong, of Pontiac (Kenneth L. Strong and C. Thomas Blakeman, of counsel), for appellees.

Mr. JUSTICE HUNT delivered the opinion of the court:

This is an appeal from an order granting defendants-appellees' motion for summary judgment in an action brought by the City of Pontiac to recover a sewer connection charge assessed against the Masons pursuant to city ordinance.

Plaintiff-appellant City of Pontiac operates, as part of the city sewer system, a sewer line known as the Vermillion Plaza sewer near the Masons' property. On June 26, 1972, their property was annexed to the City of Pontiac; four days later a building permit was signed by the city building inspector for the construction thereon of a Hornsby's Shopping Center. On October 28, 1972, the Masons were issued a plumbing permit by the city plumbing inspector; the actual physical connection to the Vermillion Plaza sewer occurred on December 1, 1972.

On August 6, 1973, the Pontiac City Council adopted an ordinance requiring the payment of a sewer connection fee. That portion of the ordinance applicable to shopping centers provided for payment of a $17,500 fee at the time of the issuance of an occupancy permit. It is agreed that on August 6, 1973, the construction of the shopping center was not complete, and, in fact, development was not completed until August 21, 1973, at which time the city issued an occupancy permit to appellees. One of the conditions of the occupancy permit was that appellees pay the $17,500 "connection charge."

The only issue raised by defendants' motion for summary judgment and which is before this court is whether or not the defendants, having physically connected their privately owned sewer pipes to the city's sewer lines in December of 1972, can be forced to pay the connection fee of $17,500 prescribed by a city ordinance passed some eight months later but prior to the issuance of an occupancy permit.

In the area of city planning, it has been common practice in Illinois for municipalities to extend trunk sewer lines to and beyond the perimeter of the incorporated areas in anticipation of expansion of residential,

commercial, and industrial developments. The next steps are for a developer to obtain annexation of the property to the municipality and to obtain proper zoning for the anticipated use. This requires a considerable amount of effort and liaison with city planners and officials. Thereafter, application is made for a building permit based upon architectural plans and specifications; fees are charged by the city to cover the cost of city inspection during the course of the construction in order to determine full compliance with all city ordinances. In addition thereto, it is necessary to obtain special permits, in this case, a plumbing permit. The plumbing inspector must visit the construction site to determine the workmanship of the connections of water and sewer pipes within the framework of the proposed construction. These fees are usually nominal in amount to cover these rather trivial inspections. At the conclusion of the construction, and at the time the builder is accepting the work from the general contractor and architect, the municipality makes a final inspection to see that all ordinances have been complied with; an occupancy or user permit is thereafter issued.

Inasmuch as the extension of the main sewer usually precedes actual use by owners or tenants by one or more years pending the development of the property, sewer construction cost recoupment is deferred until the property is developed and the identity of the ultimate user is known. In recognition of this practice, Illinois adopted, as part of the Municipal Code, section 11—150—1 (Ill. Rev. Stat. 1973, ch. 24, par. 11—150—1). This section states as follows:

> "The corporate authorities of any municipality operating a waterworks, sewerage or combined waterworks and sewerage system have the power by ordinance to collect a fair and reasonable charge for connection to any such system in addition to those charges covered by normal taxes, for the construction, expansion and extension of the works of the system, the charge to be assessed against new or additional users of the system and to be known as a connection charge. The funds thus collected shall be used by the municipality for its general corporate purposes with primary application thereof being made by the necessary expansion of the works of the system to meet the requirements of the new users thereof."

The statute specifically provides for the charge to be assessed against new or additional uses of the system and to be known as a connection charge. The statute is silent as to when this charge is to be made in regard to the development of the construction site; that is, whether it is to be assessed at the time of the building permit, the actual connection of the pipes, or at the time of the issuance of the occupancy permit.

Pursuant to the authority granted in this statute, the City of Pontiac

adopted the ordinance in question on August 6, 1973. Section I of the ordinance sets forth the policy of the city to extend lines into new and developing areas and to recoup the costs thereof from users as the properties are developed. Section II requires that every property adjacent to public sewage lines must hook onto the public sewer. Section III provides that no occupancy certificates shall be issued for any lot or parcel of land adjacent to a public sewer until the sewer connection fee has been determined and assessed. Section IV, subsection B provides as follows:

> "The Vermillion Plaza Sewer System, heretofore established by the City shall have a tap-on fee based as follows:
>
> 1. Additional shopping center tap-ons to be paid at the time of issuance of occupancy permit, $17,500.
>
> 2. Individual tap-ons, for each building, shall be determined at the time of the issuing of the permit fee."

Section V of the ordinance provides that the tap-on charges established shall be collected at the time of the issuance of building permits or occupancy permits as the case may be, and in the event they are not paid, the charge shall constitute a lien upon the premises. Section VI provides that the ordinance shall be in full force and effect from and after August 6, 1973.

The Masons contend that the application of this ordinance to their property is an unconstitutional retroactive application since there is no provision in the ordinance for assessing hookup charges to properties physically connected to the sewer prior to the date of the ordinance.

It was stipulated that the City of Pontiac has a population of less than 25,000 and is not a home rule unit under article VII, section 6 of the 1970 Illinois Constitution; the powers of the city are therefore those granted to it by statute.

The trial court, in a well-reasoned order, found that summary judgment would lie, there being no dispute in the facts as related above, and found the ordinance to be a valid exercise of the city's police powers. However, the trial court found the "ordinance goes beyond the direct grant of authority by making the charge payable at the time of occupancy" thereby creating a "one-time sewer use tax." Conceding the statute gives the city the implied power to determine the time of payment, the court found the city exceeded the authority of the statute in making a "connection charge" applicable to one already "connected" to the sewer system. We believe this is to be too narrow an interpretation of the statute.

■■ The matter of primary concern in statutory construction is the ascertainment of the intention of the legislature in adopting the particular statute. (*People ex rel. Moss v. Pate* (1964), 30 Ill. 2d 271, 195 N.E.2d 641.)

In *Gregory v. County of La Salle* (1968), 91 Ill. App. 2d 290, 296-97, 234 N.E.2d 66, the court stated:

"The cardinal rule in construction of Illinois statutes, to which all other canons and rules are subordinate, is that a statute must be construed so as to ascertain and give effect to the intention of the General Assembly as expressed in the statute. It is the intention of the General Assembly which controls, and a statute should never be construed to defeat or override the intention of the General Assembly. Where the intention of the General Assembly has been ascertained, a court must give effect to that intention if it is not in conflict with constitutional provisions." 91 Ill. App. 2d 290, 296-97, 234 N.E.2d 66, 69.

In order to ascertain the intention of the legislature as to a particular statute, consideration may be given not only to the particular language used by the legislature, but also, the reason and necessity for the law, the evils to be remedied, and the object and purpose which the legislature sought to obtain (*Mid-South Chemical Corp. v. Carpentier* (1958), 14 Ill. 2d 514, 153 N.E.2d 72). Further, in order to interpret a statute so as to promote its essential purposes, all parts, provisions or sections of the particular statute must be construed together in light of the general purpose and object of the statute. *People v. Schaffra* (1975), 30 Ill. App. 3d 600, 332 N.E.2d 163.

■■■ In the instant case, the obvious purpose of section 11—150—1 is to enable municipalities to recoup their capital expenditures in construction, expansion and extension of the works of their sewer and/or waterworks system. The phrase "connection charge" as used in section 11—150—1 must be construed together with the language of the entire section in order to promote the general purpose of the statute. (See *Chrysler Credit Corp. v. Ross* (1975), 28 Ill. App. 3d 165, 328 N.E.2d 65.) The mere fact that the legislature selected the nomenclature "connection charge" in referring to the assessment cannot be seized upon for purposes of construing the statute in such a manner as to defeat or override the intention of the General Assembly. See *Gregory*.

■■ When the language of section 11—150—1 is construed in light of the general purposes or objectives of the statute as hereinbefore outlined, it becomes clear that the statute is not one authorizing physical connections, but one authorizing the collection of fees from those who have become users of sewer systems. It is further clear that the legislative use of the phrase "connection charge" was intended as a mere name or label by which the assessment is to be known. The phrase was not intended by the General Assembly to import a limitation on the power delegated nor was it intended as a limitation on the exercise of the power by the municipality. By virtue of the fact that section 11—150—1 is a

statute authorizing the collection of fees from property owners who become users of the system, as opposed to authorizing connections for the system, it is readily apparent that the exercise of the statutory authority by a municipality against a connecting property owner is not contingent upon the moment of his connection, but upon the fact that the owner has commenced using the system. The time at which the connection to the system is made is a matter of no consequence.

■■ Defendants argue the City should be estopped from collecting the capital improvement recoupment charge because it previously assessed an inspection fee at the time of the original physical hookup. It is apparent the ordinance concerning inspections with its minimal fees is not in any way related to the connection charge ordinance, whose goal is to recoup outlays in capital expenditures. No other elements of estoppel are alleged in the pleadings or set forth in the affidavits or supporting documents; this argument is, therefore, unmeritorious.

We do not consider the above interpretation of the statute to constitute a retroactive application of the ordinance. The ordinance was passed on August 6, 1973, when the shopping center construction was not yet completed and the sewers were not being used. The ordinance was properly applied, by its own terms, to the shopping center at the time of the issuance of an occupancy permit, after the ordinance was in effect.

In the instant case, both parties moved for summary judgment; the trial court granted the appellees' motion. We agree with the trial court that there is no issue of fact in this case and that summary judgment is a proper disposition. In accordance with our opinion herein, we reverse the trial court's judgment and remand with directions to grant the City's motion for summary judgment and enter judgment thereon.

Reversed and remanded with directions.

GREEN, P. J., and REARDON, J., concur.