383 So.2d 681 (1980)
Derwin B. SMITH, II, Individually, Etc., et al., Appellants,
v.
CITY OF CLEARWATER, Florida, et al., Appellees.
No. 78-1501.
District Court of Appeal of Florida, Second District.
April 16, 1980.
Rehearing Denied May 21, 1980.
*683 Joseph P. McNulty of McNulty, Moritz & Dickey, Largo, and John T. Allen, Jr., P.A., St. Petersburg, for appellants.
Tom R. Moore, Clearwater, for appellee City of Clearwater.
Andrew J. Rodnite, Asst. County Atty., Clearwater, for appellee Pinellas County Planning Council.
GRIMES, Chief Judge.
This is an appeal from a judgment rejecting an attack by three property owners on certain amendments to the zoning ordinances of the City of Clearwater.
Appellants each own one of three contiguous parcels on a low-lying peninsula in upper Tampa Bay known as Cooper's Point. The property lies on the eastern shore of the City of Clearwater and just north of the Courtney Campbell Causeway (State Road 60). Appellants or their families have owned the three parcels for many years. Prior to the amendments at issue in this case, the city had placed all of the land in a CG zone (general business district).[1] This classification permitted single family or multiple dwelling uses with a density restriction which limited residential development to thirty-four units per acre.
During 1973 appellants combined their resources in order to develop the three parcels under a unified plan.[2] They employed an architect and planner, Robert C. Wielage, to design the project, and on December 5, 1973, he first contacted city officials to advise them of the plan he had developed. He testified that he talked with City Planning Director Paul Bergman and had several discussions with him over the next two months during which they pledged each other full cooperation in the protection of the ecology and the interest of the landowners. Mr. Wielage said that these discussions gave him no reason to believe that the city would oppose the development provided there was adequate protection for the environment.
On April 11, 1974, Mr. Wielage submitted an initial site plan to the city's planning department. Further meetings ensued between Mr. Wielage and representatives of the planning department concerning certain mangrove areas and the precise locations of the high water mark since the city's regulations required that developments be no less than thirty feet away from mangroves and begin at an elevation of not less than 1.65 feet above the mean high water mark. On June 19, 1974, Mr. Wielage tentatively submitted final plans to the city's planning department which told him that he should *684 make application to the state for a determination that the plan was not a "development of regional impact" (DRI). Mr. Wielage acceded to the city's request and made an application to the Division of State Planning. The Division of State Planning initially determined that the proposal was a DRI and that this would require the property owners to formally comply with the provisions of Chapter 380, Florida Statutes (1973), relating to approval for such a development.
Appellants amended their proposal but the state advised them that the project continued to have DRI status. Appellants then made further changes to the proposal, and on January 9, 1975, the Division of State Planning ruled that the proposal as then constituted was not a development of regional impact.
In the meantime, the city had not processed the first applications for the development submitted on November 6, 1974, because of the position taken by the Division of State Planning. Also some of the personnel of the planning department were interested in stopping the project altogether. In fact, they encouraged the Division of State Planning to continue to declare the project to be a DRI. On December 9, 1974, the planning department recommended in writing to the city manager that the city commission downzone Cooper's Point so that all upland area except the frontage on State Road 60 would fall in an RS-200 (single family residential) zone and that all non-upland areas would be classified as aquatic land. On January 6, 1975, the city commission expressed its approval of these recommendations and directed that the appropriate officials prepare ordinances to this effect.
On April 21, 1975, the city commission adopted ordinance 1561 which made its existing "aquatic lands" zoning applicable to four new wetlands areas around the city, including approximately ninety acres of Cooper's Point or more than fifty percent of appellants' property. The aquatic lands designation essentially limited use of the property placed in that zone to recreational pursuits. Then, on May 19, 1975, the commission enacted ordinance 1566 which directly affected only appellants' property. This ordinance rezoned eight and one half acres near State Road 60 from CG to CP (Parkway Business District) which was a more restricted use than CG.[3] It also rezoned the balance of the property from CG to RS-100 which restricted use of the land to single family residences with lots of not less than 10,000 square feet. The RS-100 zone was a less restrictive classification than the RS-200 zone which the planning department had earlier recommended. However, it should be noted that while up to 4.3 units per acre were permissible under RS-100, because of the peculiar geographic configuration of Cooper's Point, not more than 2.2 units per acre were physically possible. Appellant's problems were exacerbated by the fact that the Cooper's Point area is in a "Flood Plain" so that federal regulations require all residences to have their first floor of living area not less than eleven feet above mean high water. The net effect of the two ordinances was that appellants could no longer build highrise units with parking below but could only construct a limited number of single family structures on stilts.
Appellants submit that Cooper's Point is now, for all practical purposes, undevelopable. Thus, they contend that the downzoning of their property to RS-100 was void as being capricious, arbitrary, unreasonable and confiscatory. The trial court ruled against appellants on this issue, and we find no reason to disturb its decision. There was sufficient evidence from which the court could find that the disputed ordinance did not have the effect of denying appellants the beneficial use of their property in violation of the state and federal constitutions. Cf. Estuary Properties, Inc. v. Askew, 381 So.2d 1126 (Fla.1st DCA 1979), in which the property owner lost essentially all practical use of his property. Moreover, we cannot say that the decision *685 to subject Cooper's Point to RS-100 zoning was not "fairly debatable" within the well-established rules for amendments to zoning ordinances. See e.g. Central Bank & Trust Co. v. Board of County Commissioners, 340 So.2d 503 (Fla.3d DCA 1976); Town of North Redington Beach v. Williams, 220 So.2d 22 (Fla.2d DCA 1969). In this connection it should be observed that the land on the mainland to the west of Cooper's Point carried a residential zoning classification. The fact that Cooper's Point is so low that the flood plain and setback requirements work against the economies of residential development does not mean that the City of Clearwater cannot zone the property for residential use. As a practical matter, municipalities cannot be required to adjust their ordinary residential zoning classifications to take into account every peculiar land elevation and configuration.
Appellants also argue that the ordinance which rezoned their wetlands as aquatic lands constituted a "taking" for public use, requiring an inverse condemnation remedy. Once again we believe the record supports the trial court's conclusion. While there is no doubt that appellants will not be able to do much with their wetlands in the face of aquatic zoning, there wasn't very much they could have done with this land without such zoning. Except for a thirty foot strip above the high water mark, all of the property involved was submerged land. There were no bulkhead lines, and the record reflects that it was most unlikely that appellants would have been able to obtain permission to fill the land. Also, as the trial court pointed out, there were serious environmental considerations which justified the placing of appellants' wetlands within the aquatic lands zone.
Appellants' third point requires more elaboration.[4] They argue that because of the manner in which city officials dealt with them, the doctrine of equitable estoppel should prevent the city from applying the amendments to its zoning ordinance to their property. In rejecting this claim, the trial court said:
From the outset the plaintiffs have complained that the city was estopped to deny to them the development of the peninsula to which they aspire. The plaintiffs complained that the old zoning, Commercial-General, would have allowed the full development of Cooper's Point in accordance with their plans subject only to the final determination of the aquatic land boundaries. The plaintiffs also complained that throughout their official negotiations with the city they were lulled into a sense of security by the words and actions of the agents and employees of the city, who seemed to indicate acceptance of their plans subject only to a determination by the state that their plans did not constitute a "development of regional impact." The plaintiffs complained that as a direct result of the prior zoning of the peninsula and of the apparent tentative approval by the city of their proposed development, they materially changed their position, to their detriment, in reliance thereon. However, at the end of the plaintiffs' case in chief, this court granted the defendant city's motion for directed verdict with regard to the plaintiffs' allegations that the defendant should be estopped to deny to them the zoning which previously existed upon the peninsula. In our ruling, which we hereby reconfirm, we found that the optimistic interpretation by the plaintiffs of what can best be described as bare innuendo voiced by the employees and agents of the city did not give rise to a circumstance upon which the plaintiffs could legally rely. We also found and again state that the city spoke no word, committed no overt act or deed upon which the plaintiffs could have reasonably relied. Further, we found that the lack of discouragement on the part of the city did not equal the active official encouragement upon which the plaintiffs could *686 have legally relied. Finally, it was the finding of this court that the city's failure to preliminarily discourage a developer from a project which did not bask in the sunshine of city approval did not constitute, in the court's mind, an official activity or indicia as could be legally relied upon by the plaintiffs. In substance, and as was stated before, we find there simply was no hard evidence to substantiate the plaintiffs' allegations that the city should be estopped. Therefore, and again, the plaintiffs' complaint for relief under the theory of estoppel, is denied.
The doctrine of equitable estoppel will limit a local government in the exercise of its zoning power when a property owner (1) relying in good faith (2) upon some act or omission of the government (3) has made such a substantial change in position or incurred such excessive obligations and expenses that it would be highly inequitable and unjust to destroy the rights he has acquired. Town of Largo v. Imperial Homes Corp., 309 So.2d 571 (Fla.2d DCA 1975); City of Hollywood v. Hollywood Beach Hotel Co., 283 So.2d 867 (Fla.4th DCA 1973). Measuring the facts of the present case against this standard, we cannot quarrel with the court's conclusion that appellants did not present enough evidence to get past a motion for directed verdict (strictly speaking, a motion for involuntary dismissal). There simply was no showing that appellants substantially changed position or incurred large expenses in reliance upon an act or omission of the city. The most that the city did was to engage in some general "foot dragging." While it is true that some members of the city planning department were working behind the scenes to thwart the project, their overt words and actions could not be said to have affirmatively misled appellants so as to cause them to incur the legal and architectural fees that would not have been required in any event. Although there was nothing in the city ordinances which required appellants to first obtain a determination that their project was not a development of regional impact, they cannot seriously contend that this was not a reasonable suggestion, and Mr. Wielage certainly acquiesced in it. Moreover, as originally conceived, the project was a DRI which would have required that appellants obtain approval under Chapter 380 before construction could begin. Hence, appellants did not prove the elements necessary for equitable estoppel.
Our inquiry cannot stop here, however, because there is a large body of law, closely related to the doctrine of equitable estoppel, which deals with the question of whether a municipality may delay the issuance of a permit for an allowable use when it is lawfully applied for in order to gain the time necessary to enact an amendment to its zoning ordinance which would frustrate the applicant's plans for developing his property.[5] While often acknowledging the fact that a city should have issued a building permit when requested to do so, many courts apply the zoning as it exists at the time of their decision in determining whether the city should then be required to do so. Annot., 50 A.L.R.3d 596, 605 (1973); 4 R. Anderson, American Law of Zoning 309 (2d ed. 1977); 8 E. McQuillin, Municipal Corporations 455-456 (3d ed. 1976). Thus, in discussing delay or the refusal to issue a permit, Anderson states
The decisions relating to building permits and work commenced on the faith of such permits support the conclusion that nothing short of actual use of land, or a substantial change of position pursuant to a permit, prior to the enactment or effective date of a restrictive ordinance, will entitle a landowner to a nonconforming use. This premise has been challenged in cases involving administrative delay in the handling of permit applications. A typical dispute arises when a landowner *687 applies for a permit to erect a building or commence a use which is authorized at the proposed site, but which is not acceptable to adjacent owners, or is not consistent with some feature of the community plan for the development of the area. While there is some authority for the denial of a permit where a pending amendment would render issuance unlawful, most courts say that a municipality is without authority to deny a permit for a currently legal use. Municipal officials can, and sometimes do, delay issuance of a permit until the zoning ordinance is amended to prohibit the proposed use, or a court orders issuance of a permit. This administrative procrastination, calculated to deny a property owner the right to use his land in a currently lawful manner, is supportable neither by law nor by sound and ethical practice. But its use is common enough to have provided the materials for a number of judicial opinions.
Where a municipal corporation unlawfully withholds a permit, the applicant can by mandamus force the appropriate official to issue it. But the zoning power of the municipality is not suspended during the pendency of the permit application, or an action for a writ ordering issuance of the permit. This power may be employed to amend the zoning ordinance to outlaw the use. If it is so used, a court will not order a municipal official to issue the permit unless the applicant has established a right to nonconforming use of the land. This situation squarely presents the question whether such a vested right can be perfected by a timely application for a permit to establish a lawful use, followed by unwarranted administrative delay which prevents any actual use of the land prior to the restrictive ordinance. The courts have usually not upheld the applicant's claim to a nonconforming use.
1 Anderson, supra, at 421-423 (footnotes omitted).
On the other hand, although a general rule is hard to determine, Florida has in the past been more sympathetic to the property owner in cases involving this issue. In two cases in which the facts only become apparent from reading the concurring and dissenting opinions, our supreme court ordered cities to issue building permits which were within existing zoning when the property owner applied for them but which failed to comply with a rezoning ordinance passed after the applicant had commenced legal proceedings. Broach v. Young, 100 So.2d 411 (Fla. 1958); Aiken v. Davis, 106 Fla. 675, 143 So. 658 (1932). Our own court appeared to adopt this approach in City of Hollywood v. Pettersen, 178 So.2d 919 (Fla.2d DCA 1965). In Sharrow v. City of Dania, 83 So.2d 274 (Fla. 1955), and Miami Shores Village v. Post No. 124 of American Legion, 156 Fla. 673, 24 So.2d 33 (Fla. 1945), the supreme court did hold that a city could revoke a building permit already issued because the use did not comply with a new ordinance which was enacted after its issuance, but the court seems to have decided these cases on the premise that when the property owners obtained the permit, they knew of the likelihood that the city was about to amend the zoning ordinances. Yet, in City of Miami Beach v. 8701 Collins Ave., Inc., 77 So.2d 428 (Fla. 1954), the supreme court upheld the city's right to prohibit the usage of property in violation of a zoning change which it had not adopted until after it had issued a permit, and the court made no reference to forewarnings to the property owner. The court said:
This Court has never gone so far as to hold that a City will be estopped to enforce an amendment to a zoning ordinance merely because a party detrimentally alters his position upon the chance and in the faith that no change in the zoning regulations will occur. It is our view that such a doctrine would be an unwise restraint upon the police power of the government. All that one who plans to use his property in accordance with existing zoning regulations is entitled to assume is that such regulations will not be altered to his detriment, unless the change bears a substantial relation to the health, morals, welfare or safety of the *688 public. See author's comments and cases cited in 138 A.L.R. 500 (II).
77 So.2d at 430.
City of Miami Beach v. Jonathon Corp., 238 So.2d 516 (Fla.3d DCA 1970), also suggests that the Florida courts are backing away from any absolute rule with respect to the status of the zoning which is existent at the time the property owner requests a permit. There, the city had refused the property owner a building permit which was within existing zoning. One day after the trial court had issued an alternative writ of mandamus, the city council passed a resolution authorizing eminent domain proceedings which were commenced nine days later. The court later entered a peremptory writ of mandamus upon summary judgment directing the city to issue the permit. While this case involved eminent domain, the appellate court applied the reasoning of those cases involving the retroactive effect of zoning changes upon prior applications for building permits. Based upon these authorities, the court concluded that there was a genuine issue of material fact as to whether the decision to institute eminent domain proceedings constituted either an arbitrary or a bad faith act of the city.
There is an interplay between those situations in which the city is estopped because the property owner has spent large sums in reliance on the city's original position and those in which the city refuses to issue a permit for a use which is permissible under existing zoning. If the city has refused to issue the permit, the property owner often cannot run the risk of spending the money which might create the estoppel, because he is then on notice of the possibility that the city may take an adverse position. Carried to its extreme, a city could arbitrarily continue to refuse a permit and permanently deprive a property owner of the right to use his property according to existing zoning. The opinion in Naumovich v. Howarth, 92 Ill. App.2d 134, 234 N.E.2d 185 (1968), illustrates this anomaly:
Considerable difficulty is experienced in reconciling the rules announced in the authorities that, (a) rights are fixed at the time the application for a building permit is made; (b) no resolution suspending existing zoning ordinances is effective; (c) an applicant has no complaint regarding retroactive zoning unless he experienced a substantial change of position relying on existing zoning, and (d) where the City's wrongful act prevents one from acquiring a vested right, the City cannot take advantage of a situation which it caused.
.....
While the decided cases state that the rights of the parties are fixed at the time of the application for the building permit, that a municipality cannot suspend the operation of the existing law, and that the city may not take advantage of its own acts to prevent the acquisition of a vested right, so that no actual change of position is necessary to enforce the right to the building permit, nevertheless, the opposite conclusion is reached by logically applying the principles that no one has a vested right in the continuance of a law and that the ordinance applicable at the time of the decision governs. Phillips Petroleum Co. v. City of Park Ridge, 16 Ill. App.2d 555 on 565, 149 N.E.2d 344.
It, therefore, appears that the principles are made workable by inquiry into such factors as, (1) a substantial change of position before an orderly change in the law, (2) a notice of likelihood of change in the law prior to change in position of the applicant, (3) the regularity of the proceeding of the municipality to make the change, and (4) the promptness with which the municipality takes action.
234 N.E.2d at 188.
After careful consideration, we believe that the better rule and one which is consistent with most if not all Florida decisions can be stated as follows. Where a property owner meets the requirements specified in Town of Largo v. Imperial Homes Corp., 309 So.2d 571 (Fla.2d DCA 1975), the municipality will be estopped from denying him a building permit on the grounds that his project constitutes a nonconforming *689 use. However, even if he has not made the substantial expenditures in reliance upon the city's position necessary to create an estoppel, he is still entitled to obtain a building permit which is within the provisions of existing zoning so long as the rezoning ordinance which would preclude the intended use is not pending at the time when a proper application is made. For a zoning change to be pending within this rule, it does not have to be before the city council, provided the appropriate administrative department of the city is actively pursuing it. Of course, mere thoughts or comments by city employees concerning the desirability of a change are not enough. There must be active and documented efforts on the part of those authorized to do the work which, in the normal course of municipal action, culminate in the requisite zoning change. The city council or the applicable city planning board must at least be aware that these efforts are going forward. For a zoning change to be pending, however, it is not essential that the property owner be advised of these activities, except that to the extent that he is unaware of them, he might justifiably continue to expend funds upon his project which, if the matter does not in due time become public, may result in the application of equitable estoppel. See Annot., 50 A.L.R.3d 596, 620-632 (1973), for cases discussing when a proposed change is deemed pending.[6]
This rule would prevent a city from retroactively applying a zoning amendment to deny a building permit unless the amendment was pending at the time of the application for the permit. Thus, if a zoning change is deemed desirable, a city cannot wait to activate the machinery ultimately necessary to bring about the change until a property owner submits an application for a use which would only be precluded as a result of the change. This will encourage cities to keep their zoning current and at the same time provide property owners with a reasonable amount of stability upon which they can rely in making decisions concerning the use of their property.
Applying these principles to the case at hand, we think it is evident that the proposed changes in zoning were pending at the time the Division of State Planning notified appellants that their project was no longer considered a DRI. By that time the planning department had recommended the zoning changes, and the city commission had directed the department to go forward with the drafting of appropriate ordinances. Hence, the new ordinances were applicable to appellants' property.
AFFIRMED.
SCHEB and CAMPBELL, JJ., concur.
NOTES
[1] A comprehensive plan prepared for the city in 1962 designated the property as low density residential, but the city never changed the official zoning classification to reflect this recommendation.
[2] The year before, appellants had obtained the city's support for their plan to ask the state to purchase the land as an area of critical state concern. However, their efforts had been unavailing.
[3] Appellants do not attack the CP rezoning in this appeal.
[4] Appellants raise a fourth point concerning their claims against the Pinellas County Planning Council, but in view of our disposition of the case it is not necessary to discuss this point.
[5] We shall assume for the purpose of our discussion that as of January 9, 1975, appellants application for its initial permit was in full compliance with existing regulations. Actually, this was not quite so because a topographical survey was still required. However, the city did not deny the permit for lack of a survey, and, presumably, with the cooperation of the city, appellants could have furnished one within a short time.
[6] To the extent that it conflicts with these statements, we hereby recede from our opinion in City of Hollywood v. Pettersen.