537 So.2d 641 (1989)
The CITY OF KEY WEST, Appellant,
v.
R.L.J.S. CORPORATION, Acme Advisors Corporation, Neufeld Corporation, 1800 Atlantic Developers, Inc., a Florida Joint Venture Known As 1800 Atlantic Developers, Appellees.
No. 87-2810.
District Court of Appeal of Florida, Third District.
January 3, 1989.
Rehearing Denied February 15, 1989.
*642 Burke, Bosselman & Weaver and Fred P. Bosselman and William J. Turbeville, II, Boca Raton, Steve Stitt, City Atty., Key West, for appellant.
Steel, Hector & Davis and Elizabeth J. Du Fresne and Mark R. Cheskin, Morgan & Hendrick and James T. Hendrick, Key West, for appellees.
Before NESBITT, BASKIN and DANIEL S. PEARSON, JJ.
DANIEL S. PEARSON, Judge.
We address a question of first impression in this state, namely, does a municipality's assessment of developmental impact fees upon the developer of a condominium apartment building violate any constitutionally protected right of the developers where such fees are assessed after a building permit has been issued and the developers have sold a substantial number of the building units? We conclude that no constitutional right of the developers was offended by the municipality's action and reverse the trial court's contrary declaration.

I.
R.L.J.S., et al., the plaintiffs in the declaratory judgment action below, are joint venture developers of the 1800 Atlantic Condominium in Key West. In August 1981, the City of Key West approved the developers' community impact statement and site plan. Several months later, the City issued a building permit for 76 units, all of which had been sold. In October 1983, the developers obtained a building permit for 92 additional units, some 40 of which were already sold. The developers paid $19,400 in sewer connection and permit fees when they obtained this second permit.
In the spring of 1984, the City issued certificates of occupancy for the first 76 units. Thereafter, during a one-year period beginning in late 1984, the City enacted ordinances imposing separate impact fees for sewers, solid waste, and traffic.[1] As the trial court correctly observed, the purpose of these ordinances was "to allocate to new residents of the City `a fair share of the cost of new public facilities', specifically those ... dealing with sewer and solid waste treatment and those capital improvements necessitated by increased traffic on account of new development in the City." Each of the ordinances provided that "no certificate of occupancy shall be issued" until any applicable impact fee was paid. Accordingly, upon the developers' failure to pay the three impact fees, the City denied their request that certificates of occupancy be issued for the additional 92 units in the development.[2]

*643 II.
The developers filed a declaratory judgment action against the City. The trial court, convinced by Contractors and Building Association v. City of Dunedin, 329 So.2d 314 (Fla. 1976), that "an opportunity to pass on such fees to the ultimate user who causes the impact on the community is necessary for the law to meet constitutional muster," entered summary judgment for the developers on the grounds, first, that the developers were not afforded such an opportunity and, second, that the City attempted to retrospectively apply the fees after the developers' rights in the building permit had vested. In the trial court's words:
"The timing in this case is particularly significant to the Court in that it makes virtually impossible any chance of the developer citizen being able to pass on the impact fee. Because the Plaintiffs' rights in their building permit had already vested, Key West could not retrospectively impose fees that amount to a personal punishment to him. Such interference with the Plaintiffs' vested rights to complete construction in accordance with the terms of the building permits, constitute [sic] a due process violation and are [sic] therefore unconstitutional."
The City took this appeal.

III.
We disagree with the developers and the trial court that the Dunedin case holds that an impact fee is constitutional only when the developer is given the opportunity to pass the fee on to new residents, that is, the purchasers of the developed units.[3] The developers' view of Dunedin's holding is apparently drawn from several unconnected passages in the opinion:
"In principle, however, we see nothing wrong with transferring to the new user of a municipally owned water or sewer system a fair share of the costs new use of the system involves.
... .
"The avowed purpose of the ordinance in the present case is to raise money in order to expand the water and sewage systems, so as to meet the increased demand which additional connections to the system create. The municipality seeks to shift to the user expenses incurred on his account.

... .
"The cost of new facilities should be borne by new users to the extent new use requires new facilities, but only to that extent."

Contractors and Builders Association v. City of Dunedin, 329 So.2d at 317-18, 318, 321 (emphasis in original).
We reject the developer's argument that the "user" or "new user" referred to in Dunedin variously as the person who is to share the costs involved in the new use of the system, the person to whom these expenses are to be shifted, or the person who is to bear the expenses of the new facilities, is necessarily the person who purchases the condominium unit from the developer and lives in the unit. While we agree that the purchasers of and residents in the condominium unit are likely users of the area's transportation, sewer, and solid waste services, they are not exclusively so. Thus, in our view, the term "user" encompasses anyone who may derive benefit from the services, as, for example, a developer seeking to sell condominium units.
Nor can the later statement in Dunedin that "[t]he cost of new facilities should be borne by new users" be read, as the developers suggest, to mean that only those persons who actually use the services must pay for them. Plainly, the statement was not intended as a sweeping declaration that taxpayers who own property in the impacted area but do not actually use new facilities are to be relieved from the burden of paying an impact fee established by an ordinance. Instead, we believe that the proper reading of the Dunedin statements is that as between all of the taxpayers of the municipality and the specific group of *644 taxpayers in the impacted area, the latter group was to bear the cost of the required new facilities, and that no distinction is to be drawn between the developer of the property and the ultimate purchasers of units from the developer. Dunedin, then, does little to further our inquiry.

IV.
But Dunedin aside, the developers claim that the doctrine of vested rights which protects property owners and builders who rely on an act or omission by the government protects them from the impact of the impact fees.[4]
Generally, the doctrine of vested rights limits local governments in the exercise of their zoning powers when a property owner relying in good faith upon some act or omission of the government has substantially changed position or incurred such excessive obligations and expenses that it would be highly inequitable and unjust to destroy the rights that the owner has acquired. Hollywood Beach Hotel Co. v. City of Hollywood, 329 So.2d 10, 15 (Fla. 1976); City of Lauderdale Lakes v. Corn, 427 So.2d 239, 243 (Fla. 4th DCA 1983); Smith v. City of Clearwater, 383 So.2d 681 (Fla. 2d DCA 1980), review dismissed, 403 So.2d 407 (Fla. 1981). The developers say the doctrine protects them because after receiving the building permit, they reasonably believed that they knew of all the expenses that they would have to pay, and in reliance on this set prices for the units. They claim that the City's subsequent assessment of impact fees after the units were sold retroactively denied them the force and effect of the building permit.
The question thus presented has no easy answer; courts of other jurisdictions which have considered similar claims by developers have not been in agreement.[5]

A.
In City of Pontiac v. Mason, 50 Ill. App.3d 102, 7 Ill.Dec. 860, 365 N.E.2d 145 (1977), the developer received building and plumbing permits for its shopping center, and the center was connected to city sewage lines. Thereafter, the city enacted an ordinance imposing a sewage connection fee, and refused to issue a certificate of occupancy until the developer paid the fee. The appellate court upheld the fee, finding that estoppel was not established and that, since the ordinance was passed before the shopping center was finished, the ordinance authorizing the fee did not violate the developers' rights. City of Pontiac differs from the present case in one crucial respect: the project in that case was a shopping center  its units presumably to be rented, not sold  and there was no indication  and, apparently, no argument  that it would have been difficult, much less impossible, for the developer to recoup some, or a large part, or all of the connection fee.
Likewise, in Westfield-Palos Verdes Co. v. City of Rancho Palos Verdes, 73 Cal. App.3d 486, 141 Cal. Rptr. 36 (1977), an environmental excise tax imposed by the city after the developer had begun construction of condominiums was upheld and the developers' vested rights argument rejected:
"Appellants' attempt to use a vested rights principle to gain immunity from unforeseen taxes is virtually without precedent, and if followed to its logical conclusions, would shield any lawful business from newly enacted taxes if that business had made any sort of irrevocable *645 commitments, either financial or contractual, in commencing operations in that municipality. The imposition of a new tax, or the increase in the rate of an old one, is simply one of the usual hazards of the business enterprise."
73 Cal. App.3d at 494, 141 Cal. Rptr. at 42 (citations omitted).
Once again, there is concededly a crucial difference from the present case: under the California ordinance, the units that were already sold were exempted from the developer's assessed taxes. Id. at 490-91, 141 Cal. Rptr. at 39.
A different California court considered a similar issue in People v. H & H Properties, 154 Cal. App.3d 894, 201 Cal. Rptr. 687 (1984). There, a company purchased two apartment buildings and later received city approval to convert them into condominiums. Still later, the city passed an ordinance requiring those converting rental apartments into condominiums to help their displaced tenants find comparable housing and pay either moving expenses or compensation for anticipated rent increases. The appellate court held that the ordinance did not abridge any vested right of the company because the company was merely required to pay some money and was not prevented from proceeding with the condominium conversion. The court explained that "[i]f the project has lost its attractiveness, the developers are free to pull out, and they always retain the option of holding on to the units and leasing them out." 154 Cal. App.3d at 902, 201 Cal. Rptr. at 691. Because the developers in the present case could not pull out (most of the units having already been sold), H & H Properties is of little precedential value in resolving the claim before us.[6]

B.
More on point is Russ Building Partnership v. City and County of San Francisco, 188 Cal. App.3d 977, 234 Cal. Rptr. 1, review granted, 236 Cal. Rptr. 403, 735 P.2d 444, review modified, 237 Cal. Rptr. 456, 737 P.2d 359 (1987), affirmed in part and reversed in part, 44 Cal.3d 839, 244 Cal. Rptr. 682, 750 P.2d 324 (1988), appeal dismissed, ___ U.S. ___, 108 S.Ct. 253, 98 L.Ed.2d 211 (1987) and ___ U.S. ___, 109 S.Ct. 209, 102 L.Ed.2d 201 (1988).
In Russ, the plaintiff received a permit to erect an office building in San Francisco. After construction had begun, the city enacted an ordinance which provided that owners of downtown buildings containing newly developed office space could not receive a certificate of occupancy until they paid a transit impact fee. Beginning the long journey through the courts, the Russ Building Partnership sought a judgment declaring the ordinance invalid. The trial court found that the ordinance was a debatably rational development fee and that its "retroactive" application to Russ was lawful. Disagreeing, the court of appeal found that the fee could not be applied against the plaintiff since it had "obtained a vested right to complete the buildings and occupy them under the conditions in existence when the original building permits issued." 188 Cal. App.3d at 993, 234 Cal. Rptr. at 9. The California Supreme Court granted review and, although ordering that there be omitted from the court of appeal decision the discussion of vested rights,[7] nonetheless went on to make clear that it agreed with the court of appeal on the general vested rights question:[8]

*646 "Plaintiffs had been issued building permits, had begun construction, and had made a substantial financial commitment to their projects almost two years before the City enacted the TIDF ordinance. Thus, they had a vested right to complete the buildings and occupy them under the conditions contained in the permits. It is clear that if the resolutions authorizing plaintiffs' building permits did not contain the transit mitigation condition, application of the later-enacted TIDF ordinance to plaintiffs would impair their vested rights and violate due process. However, if the TIDF falls among the funding mechanisms contemplated by the resolutions, the application of the ordinance to plaintiffs is proper."
44 Cal.3d at 846, 244 Cal. Rptr. at 685, 750 P.2d at 327 (citations omitted).
Clearly, if we were to apply the law of Russ to the facts of the present case, the impact fees could not be assessed against the developers, because no provision allowing the assessment of fees was included in the building permit.[9] However, we decline to follow Russ as we do not believe that a requisite to the validity of an impact fee is that the possibility that it will be imposed at some future time be made an express condition of a building permit.

C.
The usual vested right claim involves a change of mind, a broken promise: a city issues a building permit imposing one requirement and in the course of construction imposes a different requirement. In a sense, the building permit assures the builder that he may go forward and build in accordance with the approved plans. When a new building requirement is thereafter imposed, it can be readily said that the city had changed its mind and that the rights vested in the builder by virtue of the permit have been unfairly disturbed.
But a building permit, although assuring its possessor that he may safely rely on it and build in accordance with the approved plans, provides no assurance to the possessor that a taxing authority of the very same government will not increase taxes on the property being built upon, or, as in the present case, impose fees for certain municipal services which will be especially required when the building is completed.
Illustrative of this point is State v. Oyster Bay Estates, Inc., 384 So.2d 891 (Fla.1st DCA 1980). There the developer received a dredging permit from the Board of Trustees of the Internal Improvement Fund. Later, the Legislature passed a law enabling the Department of Environmental Regulation to impose further restrictions on development. The First District held that the developer derived no vested rights from the first permit. Since the Trustees' authority was limited to certain areas, nothing they did could guarantee that the Department of Environmental Regulation, which had authority to regulate different matters, would not impose any additional requirements. Said the court,
"We therefore find no basis upon which it can be concluded that action by the Board in approving the navigational channel (a matter within its jurisdiction), conferred rights upon [the developer] with respect to construction of inland canals upon [the developer's] upland property (over which the Board had no jurisdiction)."
384 So.2d at 893.
In our view, there is likewise no basis to conclude that the action of the building department of the City in approving building plans and issuing a permit (a matter within the department's jurisdiction) conferred any right upon the developer to expect that the legislative arm of the City  its council  would not enact an ordinance imposing impact fees where warranted.
Moreover, notwithstanding the developers' apparent belief, a law enacted during work in progress or when work is complete is not vitiated by the invocation of the word "retroactive." A law is not constitutionally *647 infirm merely because the person affected is unable to divert the effects of the law to another or, here, to pass along the unanticipated costs that result from the law. Indeed, a long series of United States Supreme Court cases has upheld laws which operated retroactively.
The leading modern case is Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976). In Usery, a coal mining company challenged a law which required it to pay benefits to miners who left the company's employ before the effective date of the law. The Court clearly stated that government may impose burdens that are unanticipated:
"[I]t may be that the liability imposed by the Act for disabilities suffered by former employees was not anticipated at the time of actual employment. But our cases are clear that legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations."
428 U.S. at 16, 96 S.Ct. at 2892-93, 49 L.Ed.2d at 766-67 (footnote omitted).
In Usery, the mining company argued that competitive forces would prevent it from effectively passing on to the consumer the costs imposed by the law. The Court, however, stated that it was "for Congress to choose" who should bear the burden of the miners' disabilities. "It is enough to say that the Act approaches the problem of cost spreading rationally; whether a broader cost-spreading scheme would have been wiser or more practical under the circumstances is not a question of constitutional dimension." 428 U.S. at 19, 96 S.Ct. at 2894, 49 L.Ed.2d at 768. Similarly, in Pension Benefit Guaranty Corp. v. R.A. Gray & Co., 467 U.S. 717, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984), the Court rejected a challenge to a federal law which regulated employer withdrawals from the company's pension plan during the five months prior to the enactment of the statute. The Court dismissed the employer's claim that retroactive legislation does not satisfy due process requirements unless employers have "an opportunity to conform their conduct to the requirements of [the] new legislation." 467 U.S. at 731, 104 S.Ct. at 2719, 81 L.Ed.2d at 612 (quoting brief of employer). See also United States v. Darusmont, 449 U.S. 292, 101 S.Ct. 549, 66 L.Ed.2d 513 (1981) (upholding retroactive application of taxes); Welch v. Henry, 305 U.S. 134, 59 S.Ct. 121, 83 L.Ed. 87 (1938) (same).
Just as forceful are cases in which the buyer, not the seller, was compelled to pay an unexpected special assessment. In Moody v. City of Vero Beach, 203 So.2d 345 (Fla. 4th DCA 1967), the buyers bought a piece of property, and later learned of a special assessment for improvements performed before they bought the property. The Fourth District upheld the assessment against the buyers, saying that "[p]ublic works must be paid for even though they were constructed before any assessment was levied on their account." 203 So.2d at 347. See also Phillip Wagner, Inc. v. Leser, 239 U.S. 207, 36 S.Ct. 66, 60 L.Ed. 230 (1915) (special assessment not unconstitutional because for special benefits long since accrued); Anderson v. City of Ocala, 83 Fla. 344, 357-58, 91 So. 182, 187 (1922) ("[A]n assessment for benefits derived from improvements previously made does not constitute a deprivation of property without due process of law"); Hall v. Street Commissioners, 177 Mass. 434, 59 N.E. 68 (1901) (Holmes, C.J.); 70A Am.Jur. Special or Local Assessments § 13, at 1137 (1987) ("A special assessment may be levied upon an executed consideration, that is, for a public work or improvement already done; such an assessment interferes with no contract and divests no vested rights.").
It thus clearly appears that government can constitutionally impose burdens which are unexpected whether or not the burdens are susceptible to being passed on to another person. See Westfield-Palos Verdes Co. v. City of Rancho Palos Verdes, 73 Cal. App.3d at 494, 141 Cal. Rptr. at 42 ("The imposition of a new tax, or an increase in the rate of an old one, is simply one of the usual hazards of the business enterprise."); John McShain, Inc. v. District of Columbia, 205 F.2d 882, 883 (D.C. *648 Cir.1953) (same). Even if the developers in this case could show that the costs could not be passed on to what they call "users," they would still be liable to pay the impact fees.

V.
We acknowledge that the result we reach may seem harsh. To be sure, the developers sold most of the units in the condominium and only later found out that they had to pay more money to the City. But as we have said, absent a contractual agreement, one may not justifiably assume that taxes will remain the same or that an impact fee will not be imposed.[10] The imposition of an impact fee resulting in an unanticipated increase in a developer's cost may seem harsh, but it is not unconstitutional.
The judgment under review is reversed and the cause remanded with directions to enter judgment for the City of Key West in accordance with this opinion.
REVERSED AND REMANDED.
NOTES
[1] The Sewer Impact Fee Ordinance and the Solid Waste Impact Fee Ordinance were passed on December 4, 1984; the Traffic Impact Fee Ordinance was passed on October 15, 1985.
[2] Pursuant to a later agreement, the developers placed an apartment unit in escrow to cover the fees in the event that the developers were unsuccessful in their challenge. In return, the City issued the certificate of occupancy.
[3] The developers question neither the purpose for which the assessment was made nor the amount of the assessment; their claim is simply that the fee may not be applied to them because they are unable to pass it on to "users."
[4] The doctrine of vested rights/equitable estoppel was used by the parties and the trial court as the analytical framework for assessing the developers' claim. While equitable estoppel is derived from equity, and vested rights from constitutional and common law, Florida courts have employed the concepts interchangeably. See Rhodes, Hauser & DeMeo, Vested Rights: Establishing Predictability in a Changing Regulatory System, 13 Stetson L.Rev. 1, 2 (1983); Jaslow, Understanding the Concept of Equitable Estoppel in Florida, 38 U.Miami L.Rev. 187 (1984). Hereafter, we will usually refer only to vested rights.
[5] The developers cite a number of cases in which impact fees were assessed before the building permit was issued, thus giving the developer an opportunity to pass the fee on to the "user." That this occurred or was even a usual practice does not, of course, mean that it is constitutionally required that impact fees be imposed before building permits are issued.
[6] In a section of Russ Building Partnership v. City and County of San Francisco, 188 Cal. App.3d 977, 994, 234 Cal. Rptr. 1, 10 (1987), later withdrawn from publication, see 199 Cal. App.3d 1496, 246 Cal. Rptr. 21 (1987), the court of appeal observed that "[w]hile the court in H & H Properties noted that developers of completed projects are free to withdraw from plans to convert apartments into condominiums, plaintiffs herein have little use for a partially completed project if they choose not to continue because of the burden of the fee imposed."
[7] The edited version of the court of appeal decision is at 199 Cal. App.3d 1496, 246 Cal. Rptr. 21.
[8] After granting review, 236 Cal. Rptr. 403, 735 P.2d 444, the court limited it to two other issues in the same part of the appellate opinion discussing vested rights, that is "(1) whether extrinsic evidence is relevant for interpreting the building permit; and (2) whether the permit, properly interpreted, gave adequate notice to appellants of the development fee imposed after the permits were issued." 237 Cal. Rptr. at 456, 737 P.2d at 359.
[9] The California Supreme Court expressed no views on the continued validity of Westfield-Palos Verdes Co. or People v. H & H Properties. Also, it is not clear from any of the opinions in the case whether the plaintiffs would have had the opportunity to pass the impact fees on to the tenants.
[10] This is not to say, however, that businesses are completely at the risk of every cost increase. A municipality is limited in the size of impact fees it may impose; it may not impose a fee so formidable as to deny the property owner all reasonable use of the property. Hollywood, Inc. v. Broward County, 431 So.2d 606, 611 n. 6 (Fla. 4th DCA 1983). If an impact fee is too great, the developer may attempt to rescind his contract with the buyer by claiming commercial impracticability. See § 672.615, Fla. Stat. (1987) ("Excuse by failure of presupposed conditions"). See generally Restatement (Second) of Contracts §§ 261, 264 (1981); J. Calamari & J. Perillo, The Law of Contracts § 13-8 (2d ed. 1977); 1 J. White & R. Summers, Uniform Commercial Code § 3-9 (3d ed. 1988).

The fees collected must be earmarked for the substantial benefit of the residents, Hollywood, Inc. v. Broward County, 431 So.2d at 606, and may not exceed a pro rata share of reasonably anticipated costs of expansion. The money collected may be used only to meet the costs of expansion. Contractors and Builders Assocation v. City of Dunedin, 329 So.2d 314, 320 (Fla. 1976). See also Home Builders and Contractors Association v. Board of County Commissioners, 446 So.2d 140, 143-44 (Fla.4th DCA 1983). Additionally, developers can try to avoid the problem of unanticipated fees. Real estate transaction reference books warn about the need to plan for unexpected special assessments. One leading book on Florida real estate law instructs "[t]hat to avoid dispute, many contracts include a term which specifies which party shall be responsible for the payment of the assessment." 1 R. Boyer, Florida Real Estate Transactions § 4.28, at 4-72 (1988). See also A. Arnold, J. Douglas, & D. Feld, Modern Real Estate and Mortgage Forms § 30 (1986); S. Goldberg, Sales of Real Property 387-91 (1971).