944 A.2d 1149

**F.D.R. SROUR PARTNERSHIP, et al.**

**v.**

**MONTGOMERY COUNTY, Maryland.**

No. 2208, Sept. Term, 2006.

Court of Special Appeals of Maryland.

March 27, 2008.

110

Stephen J. Orens (Rebecca D. Williams, Casey L. Moore, Miles & Stockbridge on the brief), Rockville, for Appellant.

Scott R. Foncannon (Karen L. Federman Henry, Marc P. Hansen, Deputy County Atty., Leon Rodriguez, County Atty. on the brief), Rockville, for Appellee.

Panel: HOLLANDER, JAMES R. EYLER, MEREDITH, JJ.

HOLLANDER, Judge.

This appeal involves a challenge to a decision of the Maryland Tax Court, which upheld an assessment of Montgomery

County's Development Impact Tax for Transportation Improvements ("Impact Tax") in connection with two building permits obtained by F.D.R. Srour Partnership ("Srour") and Robert Srour ("Mr. Srour"), appellants. The Tax Court agreed with Montgomery County (the "County"), appellee, in rejecting appellants' claims that they were exempt from the Impact Tax because their project began before the effective date of the amended Impact Tax ordinance, and because they had a vested right in the law as it existed prior to the effective date of July 1, 2002. Unhappy with the Tax Court's ruling, which required appellants to pay an Impact Tax of approximately $300,000, appellants sought judicial review in the Circuit Court for Montgomery County. That court affirmed.

This appeal followed. Appellants present two issues, which we have reworded slightly:

I. Did the circuit court err in sustaining the Maryland Tax Court's holding that the Development Impact Tax that the department of permitting services sought to collect, pursuant to County Council Bill No. 47–01, is applicable to the issuance of Permit No. 4 and Permit No. 5, when "A" building permit was issued for the subject development prior to the July 1, 2002 prospective effective date of the Development Impact Tax?

II. Did the circuit court err in sustaining the Maryland Tax Court's holding that the commencement of construction pursuant to Permit No. 1, for which application was made prior to the July 1, 2002 prospective effective date of the Development Impact Tax, did not vest appellants' right to complete the project without the imposition of the Development Impact Tax?

For the reasons that follow, we shall affirm.

## I. FACTUAL AND PROCEDURAL SUMMARY

Effective July 1, 2002, the County enacted Chapter 4 of the Montgomery County Laws of 2002, which amended the County's "Development Impact Tax for Transportation Improve-

ments," codified at Montgomery County Code ("County Code"), § 52–47 *et seq.* (2004). The Impact Tax is a tax on "development," defined in County Code, § 52–47 as "the carrying out of any building activity or the making of any material change in the use of any structure or land which requires issuance of a building permit and: (1) Increases the number of dwelling units; or (2) Increases the gross floor area of nonresidential development." The Impact Tax, which is assessed when a developer applies for a building permit, *id.*, § 52–49(a) & (b), § 52–50(b) & (c), is "intended to defray a portion of the costs associated with . . . transportation improvements that are necessary to accommodate the traffic generated by . . . development." County Code, § 52–47.[1] Until 2002, the Impact Tax only applied in designated geographical areas within the County. However, the 2002 amendment broadened the Impact Tax to apply County-wide. Moreover, the 2002 amendment stated that it "applies to any development for which an application for a building permit is filed on or after [July 1, 2002]." 2002 Laws of Montg. Co., ch. 4, § 2(a).

In 1988, Mr. Srour, a licensed Professional Engineer, and his company, F.D.R. Srour Partnership, acquired an undeveloped parcel of real property in the County that sits immediately outside the city limits of Rockville, in a subdivision called Burgundy Park (the "Property"). As a result of the 2002 amendment, the Property is now located within a geographical area that is subject to the Impact Tax.[2]

Appellants planned to build two warehouses on the Property. However, the topography of the Property presented significant challenges for construction. The Property rose sharply from an elevation of 372 feet at its street-level access

---

1. The County Code contains another "development impact tax" for "public school improvements." That tax, codified at County Code, ch. 52, art. XII, §§ 52–87 *et seq.*, is not implicated here.

2. The Property was created by the recordation of Plat No. 19003 on April 22, 1993, which vested Preliminary Plan No. 1–88333, approved on April 16, 1990, by the Montgomery County Planning Board. *See also* Confirmatory Plat No. 22856, recorded on May 6, 2004.

to Southlawn Lane up to a height of 444 feet along its southern boundary, and dipped below 360 feet along its eastern edge. The grade was 25% in places. Additionally, the Property is bounded by a forest conservation easement along the slope at its eastern side. As a result, appellants had difficulty designing a feasible warehouse plan. After finally obtaining a design that stabilized the steep topography of the Property, appellants proceeded with the permitting and construction process.

On June 6, 2002, less than a month before the July 1, 2002 effective date of the 2002 amendment to the Impact Tax, appellants filed a building permit application with the County Department of Permitting Services ("DPS"), Application No. 279528 ("Permit 1"), along with a plan view depicting the two proposed warehouses. Permit 1 pertained to the first structures to be constructed as part of the warehouse facilities—three retaining walls and two gabion walls. Then, in November of 2003, appellants filed for a sediment control permit application with DPS. Appellants subsequently revised their application for Permit 1; the permit was issued by DPS on December 23, 2003. No demand was made for the payment of the Impact Tax upon the release of Permit 1.

Two of the retaining walls that are covered by Permit 1 are located on the western side of the Property, along the sides of the driveway that provides the only access to the Property via Southlawn Lane (hereinafter "Wall 1 and Wall 2"). Wall 2 is attached to "Building A," one of the warehouse buildings that was ultimately constructed on the Property. The third retaining wall ("Wall 3") is located on the eastern side of the Property and is also attached to Building A. Construction commenced on Wall 3 in January 2004; it was the first wall constructed pursuant to the issuance of Permit 1.[3]

The two gabion walls are made of "basketball" size rocks. One wall is situated at the western boundary of the Property along Southlawn Lane, and the other is situated on the

---

**3.** We pause to note that we have used the numbering scheme adopted by appellants.

eastern side of a stormwater management pond that is also on the western side of the Property.

According to appellants, the five walls, i.e. Walls No. 1–3 and the two gabion walls, are all essential and recognizable elements of the now-completed industrial buildings. In general, the various walls served two necessary purposes. First, they were needed to adapt the severe terrain of the Property to create a flat surface on the Property large enough to build the warehouses. Second, they enabled access to the resulting surface from the Property's entrance at Southlawn Lane, which was at a significantly lower elevation.

Appellants submitted two more permit applications relating to construction of retaining walls on the Property. Appellants applied for Permit No. 326449 ("Permit 2") on December 1, 2003; it was issued on January 2, 2004. Permit No. 338122 ("Permit 3"), for which appellants applied on March 23, 2004, was issued on June 16, 2004. No Impact Tax was assessed for Permits 2 or 3, and construction was commenced and completed under both.

On July 27, 2004, appellants applied for the building permits needed to construct the two warehouse buildings: Permit No. 352990 ("Permit 4") pertained to Building A, and Permit No. 352996 ("Permit 5") applied to the second building, "Building B." The permit application for Building A listed its area as 38,374 square feet, while the application for Building B listed its area at 79,875 square feet.

In June 2005, DPS notified appellants that Impact Tax payments were due for each building, prior to issuance of Permits 4 and 5. The Impact Tax was assessed at the statutory rate of $2.50 per square foot, in the respective amounts of $95,935 for Building A and $199,687.50 for Building B, for a total Impact Tax of $295,622.50.

By letter dated July 28, 2005, appellants contested the assessments and asked the Director of DPS to reconsider. Pending resolution of the issue, and in lieu of paying the assessed amounts, appellants submitted a letter of credit in the amount of the Impact Tax on July 27, 2005, pursuant to County Code, § 52–56. DPS issued permits for the two

warehouse buildings the same day, and appellants commenced construction of the warehouses; construction was completed during the pendency of this case.

In a letter dated August 18, 2005, the Director rejected appellants' position. Referring to Permit 1, he wrote that "a permit for a retaining wall does not serve to exempt subsequent development from the tax. Accordingly, it is this Department's determination that the impact tax is due and payable."

Pursuant to County Code, § 52–56, as well as Md.Code (2004 Repl.Vol.), § 3–103 of the Tax–General Article ("T.G."), appellants filed an appeal with the Maryland Tax Court on September 14, 2005, seeking review of the Director's decision. Appellants and the County submitted stipulations to relevant facts, and the Tax Court heard the testimony of Robert Srour. At the close of argument on February 22, 2006, the court ruled from the bench, in favor of the County. In part, the Tax Court said:

> We'll start with the tax issue. It doesn't appear to me that there is the same vested rights in tax cases as there might be in zoning. That clearly taxing jurisdictions have the right to change taxes on property.... One could say that's exactly what occurred here.... That being the case, the arguments for vesting, I don't think really apply in this matter.
>
> Which brings us to an interpretation of what exactly does the [effective date provision] mean.
>
> * * *
>
> [T]he building permits that were approved, or at least applied for prior to that date, had no square feet. They were all walls. And that the County didn't try to collect the tax until there was a building permit that related to a structure that had some sort of square feet, and then they could calculate the tax.... So I think in every instance what they're looking to are building permits that increase the number of square feet. And any project where there is a permit applied after July 1, '02 that increases the square

feet that would then fall within the taxing jurisdiction of this statute.

The facts of this matter, the first time a permit was applied for for a structure of any sort that included square feet was well after the effective date of July 1st, 2002.... The only question was whether or not this property was subject to this statute, and it's my determination that, in fact, it was.

An order denying appellants' petition followed on April 4, 2006.

Thereafter, on April 7, 2006, appellants filed a Petition for Judicial Review in the circuit court, pursuant to Md. Rule 7–201, T.G. § 13–532, and Md.Code (2004 Repl.Vol., 2007 Supp.), § 10–222 of the State Government Article. The circuit court affirmed in an oral ruling from the bench on September 21, 2006, stating, in part:

I guess, the bottom line is, [appellants] just haven't convinced me.... [Y]ou're saying "building activity" meant the retaining walls, which went with the building, and therefore everyone slides in under the tag.... And you're saying it vested at that point.... And I just disagree with you. I agree with the Tax Court, is the bottom line.

\* \* \*

I think it's a strange construction of ... the Act. Because they're talking about a broader meaning of "development" than simply filing a permit to get your footings in, or your retaining wall in, or anything else. And I think that's where we disagree.

\* \* \*

Therefore, I will affirm the ruling of the Maryland Tax Court in connection with this case.

The court issued an Order to that effect on October 18, 2006.

## II.  STATUTORY SCHEME

Before we discuss the parties' contentions, it is helpful to review the statutory scheme.

On March 21, 2002, the Montgomery County Executive signed into law Chapter 4 of the 2002 Montgomery County Laws, amending the County's Development Impact Tax statute. 2001 Council Bill No. 47–01, *enacted as* 2002 Montg. Co. Laws, ch. 4. The Development Impact Tax ordinance (hereinafter, "the Act") is codified at Chapter 52, Article VII of the County Code.[4]

The Impact Tax was originally established in 1986, when the County Council enacted the predecessor "development impact fee" statute, then codified at County Code, §§ 49A–1 *et seq.* The development impact fee statute imposed "fees" on construction in two designated geographical areas within the County. *See Eastern Diversified Properties, Inc. v. Montgomery County,* 319 Md. 45, 48–49, 570 A.2d 850 (1990). The primary change implemented by the 2002 enactment was to extend the Impact Tax to all areas of the County. As noted, the amendment provided that the tax would apply "to any development for which an application for a building permit is filed on or after [July 1, 2002]."

The County Council created the Impact Tax to permit growth in the County while also ensuring necessary improvements to support the increased demand on transportation facilities. County Code, § 52–48. The funds generated by the Impact Tax may only be used for specified County transportation uses, such as construction or expansion of roads or acquisition of public transportation vehicles. *See* County Code, § 52–58. The tax is "a pro rata per unit or per square foot of gross floor area tax imposed *before a building permit is issued for development ...*" County Code, § 52–47 (emphasis added). DPS determines the applicability of the Impact Tax when it reviews an application for a building permit and then, if the Act applies to the proposed construction, it collects the Impact Tax before issuing a permit. County Code, §§ 52–50, § 50–51.

---

4. The relevant provisions remain unchanged since their enactment by 2001 Council Bill No. 47–01. *See* County Code (2004 & Jan./Feb.2008 Supp.).

Under the Act, "[a]pplicants for building permits for development ... must supply to the Department of Permitting Services for each requested building permit ... [t]he gross floor area and type of development for nonresidential development." County Code, § 52–50(b). The Act also directs that DPS "must not issue a building permit for development ... unless" the Impact Tax obligation has been satisfied. County Code, § 52–50(c). The question, then, is what constitutes "development"?

County Code, § 52–47 defines "development" as follows:

[T]he carrying out of any building activity or the making of any material change in the use of any structure or land which requires issuance of a building permit and:

(1) Increases the number of dwelling units; or

(2) Increases the gross floor area of nonresidential development.

In turn, "gross floor area" is defined in County Code, § 52–47:

*Gross floor area* means the sum of the gross horizontal area of the several floors of a building or structure measured from the exterior faces of the exterior walls.... In a covered but unenclosed area, such as a set of gasoline pumps or a drive-through area, gross floor area means the covered area. Gross floor area does not include:

(1) basement or attic areas with a headroom of less than 7 feet 6 inches;

(2) areas devoted to unenclosed mechanical, heating, air conditioning, or ventilating equipment;

(3) parking structures; or

(4) accessory structures to a residential building.

In addition, County Code, § 8–24 specifies when issuance of a building permit is required:

It shall be unlawful to construct, enlarge, alter, remove or demolish a building ... without first filing an application with the department in writing and obtaining the required

permit therefor;  except that ordinary repairs . . . shall be exempt from this provision.

*See also* County Code, § 52–47 (*"Building permit* means a building permit issued by the Department of Permitting Services under Chapter 8.").

The Impact Tax obligation is calculated for nonresidential development on a per square foot basis.  The rate varies in accordance with the type of building and the geographical area of the County within which the development is located.  *See* County Code, § 52–57.  Office and retail buildings pay the highest rates.  *Id.*  At the low end of the range, hospitals and "bioscience facilities" are entirely exempt, and places of worship and private elementary and secondary schools pay fractions of a dollar per square foot.  Industrial buildings and "other nonresidential" buildings pay an intermediate rate.  *Id.* In the 2002 enactment, the industrial rate for the "County Area," in which appellants' Property sits, was $1 per square foot.  2002 Montg. Co. Laws, ch. 4, § 1.  The 2002 legislation also contained a phase-in provision: for the first six months that the Impact Tax was in effect, taxpayers paid at 25% of the statutory rate.  The percentage rose by 25% every six months, with the full rate phased in beginning January 1, 2004.  *Id.* § 2(b).  Since the passage of the 2002 bill, the rates have been raised by statutory amendment.  2003 Council Bill No. 31–03, *enacted as* 2003 Montg. Co. Laws, ch. 27 (effective March 1, 2004).  The current statutory rate for industrial and "other nonresidential" buildings, at which appellants' assessments were calculated, is $2.50 per square foot.  County Code, § 52–57.

When the predecessor "development impact fee" ordinance was enacted in 1986, the County purported to draw its authority to impose the fees from its "police power."  However, in 1990, in *Eastern Diversified Properties, Inc., supra,* 319 Md. 45, 570 A.2d 850, the Court of Appeals struck down the development "fees."  Ruling on a challenge to the fees brought by a real estate developer, the Court held that the County's police power authority did not support assessment of the fees.  *Id.* at 55, 570 A.2d 850.  It reasoned that "the

development impact fee imposed on new development is exacted solely for revenue purposes, is an involuntary payment of money, and the funds raised by the fee are used to finance road construction which benefit[s] the general public." *Id.* In the Court's view, these features of the development impact "fee" distinguished it from a regulatory charge, which would be supported by the police power authority, and rendered it, in fact, a tax. *Id.* at 53–55, 570 A.2d 850. The *Eastern Diversified* Court did not decide the nature of the tax however, *id.* at 55 n. 4, 570 A.2d 850, and therefore did not reach the question of whether the County had authority to impose the fee under its taxing power.

The County responded to the *Eastern Diversified* decision by enacting emergency legislation that replaced the word "fee" with "tax" throughout the statute; asserted its authority to impose the development impact "tax" under the County's limited grant of tax power; and retroactively ratified as "taxes" the charges previously imposed under the rubric of development impact "fees." *See* 1990 Council Bill Emergency Bill No. 33–90, *enacted as* 1990 Montg. Co. Laws, ch. 40.

The Court of Appeals ruled on the validity of the amended statute in *Waters Landing Ltd. Partnership v. Montgomery County,* 337 Md. 15, 24–25, 650 A.2d 712 (1994), upholding the development impact tax. It determined that the tax was an excise tax and not an intangible personal property tax, and thus it was within the County's taxing power. *Id.* at 25, 650 A.2d 712. The Court also upheld the County's retroactive imposition of the tax. *Id.* at 33, 650 A.2d 712.

The development impact tax statute was amended a handful of times throughout the 1990s for various reasons. The 2002 amendments brought appellants' building activity within the purview of the ordinance by adding a new "General" area to the various geographical "areas" previously covered by the tax. It consists of all parts of the County that are not contained within another specified area. County Code, § 52–49(c), *as amended by* 2002 Montg. Co. Laws, ch. 4.

### III. DISCUSSION

#### A.

■■■■ Despite its name, the Maryland Tax Court is actually an administrative agency. *See* T.G. § 3–102. Therefore, principles of administrative law guide our review. *See, e.g., Montgomery County v. Wildwood Medical Center, LLC,* 176 Md.App. 731, 737 n. 1, 934 A.2d 484 (2007). Our role in reviewing the Tax Court's decision is to determine "whether the administrative agency erred, not whether the Circuit Court erred." *Comptroller of Treas. v. Phillips,* 384 Md. 583, 590, 865 A.2d 590 (2005). We defer to the Tax Court's findings of fact, *Rouse–Fairwood Dev. Ltd. Partnership v. Supervisor of Assessments for Prince George's County,* 138 Md.App. 589, 617–618, 773 A.2d 535 (2001) (citing *CBS, Inc. v. Comptroller of the Treas.,* 319 Md. 687, 697–98, 575 A.2d 324 (1990)), and will not " 'overturn the Tax Court's decision unless it was based on an error of law.' " *Comptroller of Treas. v. Colonial Farm Credit,* 173 Md.App. 173, 177, 918 A.2d 514 (2007) (quoting *Dept. of Assessments and Taxation v. Consol. Coal Sales Co.,* 382 Md. 439, 455, 855 A.2d 1197 (2004)). *See Comptroller of Treas. v. Citicorp Int'l Communications, Inc.,* 389 Md. 156, 163–64, 884 A.2d 112 (2005) (discussing standard of review of Tax Court decisions); *Md. Aviation Admin. v. Noland,* 386 Md. 556, 570–74, 873 A.2d 1145 (2005) (discussing standard of review of agency decisions).

In this case, appellants and the County agree that there are no disputed questions of fact. Therefore, this Court's role, like that of the circuit court, is to determine whether the Tax Court's decision was legally correct.

■■■■ Because this case requires us to construe the Impact Tax ordinance, we pause to review the principles of statutory construction that guide our analysis. We review local laws and ordinances under the same principles that govern our construction of State statutes. *O'Connor v. Baltimore County,* 382 Md. 102, 113, 854 A.2d 1191 (2004); *Young v. Anne Arundel County,* 146 Md.App. 526, 573, 807 A.2d 651, *cert.*

*denied,* 372 Md. 432, 813 A.2d 259 (2002). Our task is to determine legislative intent, and our primary tool in this task is the statutory text. *O'Connor,* 382 Md. at 113, 854 A.2d 1191; *Heartwood 88, Inc. v. Montgomery County,* 156 Md. App. 333, 358–59, 846 A.2d 1096 (2004) (citing cases). "If the statute is not ambiguous, we generally will not look beyond its language to determine legislative intent." *Heartwood 88,* 156 Md.App. at 359, 846 A.2d 1096 (citing *Kaczorowski v. Mayor & City Council of Baltimore,* 309 Md. 505, 515, 525 A.2d 628 (1987)). In other words, "[w]here . . . the language of the statute is unambiguous, the search for legislative intent *ordinarily* begins and ends with the statutory language." *Harris v. State,* 344 Md. 497, 510, 687 A.2d 970 (1997) (emphasis in original). If a specific term is not defined in the statute, the Court "will give that term its ordinary and natural meaning and will not resort to subtle or forced interpretations for the purpose of extending or limiting the operation of the statute." *Maryland–National Capital Park and Planning Commission v. State Department of Assessments and Taxation,* 110 Md. App. 677, 689, 678 A.2d 602 (1996), *aff'd,* 348 Md. 2, 702 A.2d 690 (1997). But, we may consider "the dictionary definition of [a] word," although dictionary definitions are not dispositive of legislative intent. *Stachowski v. Sysco Food Servs. of Baltimore, Inc.,* 402 Md. 506, 525–26, 937 A.2d 195 (2007). *See also Benson v. State,* 389 Md. 615, 634–35, 887 A.2d 525 (2005); *Board of License Commissioners for Prince George's County v. Global Express Money Orders, Inc.,* 168 Md.App. 339, 348, 896 A.2d 432 (2006).

## B.

Appellants' banner argument is that the effective date provision of the 2002 amendment should be interpreted such that, so long as one application for a building permit was filed before the effective date of July 1, 2002, all subsequent permit applications pertaining to the same project necessarily relate back to the date of the first permit application, thereby exempting all subsequent permits from the Impact Tax. Because appellants applied for their first building permit before

July 1, 2002, when the current version of the ordinance went into effect, they contend that they are exempt from the Impact Tax with respect to the permits in issue. Appellants posit:

> The "development" of the subject property began before there was a countywide Development Impact Tax and was completed after that tax was enacted and Appellants submit that [the] clearly articulated legislative intent of the County Council, stated in the Bill itself, was not to apply the new tax to developments that were underway when the new tax became effective.

\* \* \*

> The Circuit Court erred as a matter of law when it upheld the Maryland Tax Court's misinterpretation of Bill No. 47–01 as applying the Development Impact Tax to DPS' issuance of Permit No. 4 and Permit No. 5 for the completion of a "development" for which the first of seven building permit applications was submitted prior to the prospective effective date of Bill No. 47–01.

██ Under County Code, § 52–47, the Impact Tax is a "tax imposed before a building permit is issued *for development* ...." (emphasis added). As noted, the amendment that took effect on July 1, 2002, "applies to any development for which an application for a building permit is filed on or after that date." 2002 Montg. Co. Laws, ch. 4, § 2(a). Therefore, in order for appellants' argument to succeed, the building permit for which they first applied in June 2002 to construct retaining walls on the Property must have been "for development" within the meaning of the Impact Tax. In this regard, appellants contend:

> The building activities that occurred pursuant to the application and issuance of Permit No. 1 are within the statutory definition of "development" for which "a" "building permit" was applied for prior to July 1, 2002. Therefore, the taxable event—the date of finality for imposing the Development Impact Tax occurred when the application of Permit No. 1

was submitted, prior to the prospective effective date of Bill No. 27–01. The applications for Permit Nos. 4 and 5 for the completion of building activities were not taxable events and are exempt from the Development Impact Tax, as intended by the County Council.

As we have seen, the term "development" is defined in County Code, § 52–47:

Development means the carrying out of any building activity or the making of any material change in the use of any structure or land which requires issuance of a building permit and:

(1) Increases the number of dwelling units; or

(2) Increases the gross floor area of nonresidential development.

Appellants do not contend that the provisions of the Act relating to residential development apply here. But, appellants and the County stipulated in the Tax Court that "[a] retaining wall is . . . a structure for which a building permit is required." Therefore, whether appellants' June 2002 application for a permit to build retaining walls was a building permit "for development" hinges on whether the retaining walls "[i]ncrease[d] . . . gross floor area of nonresidential development," within the meaning of the Act.

In support of their position that Permit 1 pertained to "development," appellants observe that "Maryland [c]ase law has previously recognized the essence and necessity of retaining walls, considering them to be integral parts of structures due to their support and stabilization." Appellants add: "Retaining walls can be so 'inextricably connected' to and 'the first step in building' a structure that the retaining walls are development." Insisting that "the application of Permit No. 1 and subsequent construction constituted 'development,'" they argue:

Permit No. 1 enabled Appellants to establish a building pad. The building pad is large enough to construct the approved warehouse facilities, in other words, construct the contemplated gross floor area of the warehouse facilities.

The retaining walls constructed pursuant to the issuance of Permit No. 1 all connect to and structurally support the warehouse structures and are necessary to stabilize the steep topography of the Subject Property. Without the retaining walls, no construction on the Subject Property could have occurred.

\* \* \*

[T]he retaining walls are more than mere site preparation, but are "inextricably connected" to the construction of the warehouse facilities.... Wall Nos. 1–3 are indispensable parts of the warehouse facility that connect to and support the warehouse structures. Without Wall Nos. 1–3 the warehouse structures would not have been constructed—gross floor area would not have been increased on the Subject Property.

\* \* \*

In this case, the retaining walls allowed for the gross floor area and are integral parts of the warehouse facilities, but the building activity was not actually completed until the construction of the warehouse structures was completed. The retaining walls are integral structural parts of the warehouse facilities and without the retaining walls the warehouse facilities cannot be constructed.... Construction of the retaining walls and warehouse facilities, because of their cohesiveness, constitute the same building activity contemplated under Permit No. 1 and depicted on the plans submitted in conjunction with the building permit application for Permit No. 1.

The County responds, in part:

Although construction of a retaining wall may **facilitate** development, and could even be a necessary part of an overall project, it does not ... increase the gross floor area of nonresidential development. As a result, DPS did not impose or collect the tax for Permits 2 or 3 for retaining wall construction. Unlike the retaining walls, the final two

permits ... (Permits 4 and 5), involved building activity that required a building permit *and* would increase the gross floor area of nonresidential development—the warehouses satisfied the definition of "development" under the statute, and DPS applied the impact tax to those two permits. (Boldface added; italics in original).

As we have seen, appellants maintain that "the intended taxable event was the application for the first building permit required for Development.... Any building permit filed after the first permit for the completion of building activity commenced under the first permit was not a 'taxable event'." We conclude, however, that appellants' June 2002 permit application to construct retaining walls did not constitute a permit "for development." Therefore, the date on which the Permit 1 application was filed is of no moment. We explain.

Appellants rely on *Pemberton v. Montgomery County*, 275 Md. 363, 340 A.2d 240 (1975), to support their position that their initial permit was a permit for "development" under the Act. In *Pemberton*, the Exxon gasoline company received a zoning variance to build a service station on property it owned in Montgomery County. *Id.* at 365–66, 340 A.2d 240. Under the County's then-current zoning law, zoning variances were " 'valid for a period of twelve months, during which time a building permit for such erection or alteration must be obtained and the erection or alteration started.' " *Id.* at 366, 340 A.2d 240 (quoting County Code, § 111–32(c) (1955)).[5] Exxon proceeded with preliminary planning, site inspection, and demolition. However, as the *Pemberton* Court described, 275 Md. at 367, 340 A.2d 240,

it was not until 19 August 1969, one day before the end of the twelve-month period ... that, all on the same day, Exxon: obtained a building permit for the construction of a retaining wall; dug a trench with a backhoe on the southeast side of the property; and then, after installing horizon-

---

5. The County Code has since been amended and recodified, and the successor law is now codified at County Code, § 59–A–4.53.

tal steel rods for support, poured five to six yards of concrete into the excavation for footings.

Exxon's use of the property as a service station was challenged on the ground that it had not obtained a permit to build the actual service station within the twelve-month period, and that "the construction of a footing for a retaining wall was not sufficient to satisfy the requirement." *Id.* (internal quotations omitted). In upholding the County Board of Appeals's decision in favor of Exxon, the *Pemberton* Court observed, *id.* at 368, 340 A.2d 240:

'[A] building permit' does not necessarily translate into a permit only for a building as such.... [I]n this case, a 'building permit' allowing commencement of a service station project can be a permit for the construction of a portion of that project such as the foundation or retaining wall and it is therefore not limited ... to a permit for the erection of a building....

Thus, the Court quoted the County Board's decision with approval: " '[T]he retaining wall was an indispensable part of the support of the gasoline station building made necessary because the site slopes sharply to the rear of the lot,' and, therefore, the retaining wall permit was part and parcel of the permit for building the station...." *Id.*

Analogizing to *Pemberton,* appellants reason that their retaining walls were also "indispensable parts" of their warehouse facilities. They maintain that, without the retaining walls, "the warehouse structures would not have been constructed—gross floor area would not have been increased on the Subject Property. Therefore, the application for Permit No. 1 and subsequent construction constituted 'development.' "

In our view, appellants' reliance on *Pemberton* is misplaced. In *Pemberton,* the relevant date was the expiration of a zoning variance, not the effective date of a tax statute. The County Board in *Pemberton* ruled that Exxon's building permit for a retaining wall satisfied the requirements of the County's zoning law, because it constituted the beginning of construction of a service station for which Exxon had received a variance. *Id.*

at 369, 340 A.2d 240. There was no statutory provision that specified what sort of permit would constitute commencement of construction of the station, and the County Board reasoned: " 'Since every building must begin with a foundation, common sense indicated that obtaining a permit to begin where one must begin, *i.e.*, with a foundation, is sufficient.... [Exxon] would have had to start construction with the foundation regardless of the kind of building permit first obtained.' " *Id.* at 369, 340 A.2d 240 (quoting County Board). The Court of Appeals held that the Board's decision was "based upon a foundation of evidence which is at least 'fairly debatable,' and therefore, we cannot disturb it." *Id.*

In contrast to *Pemberton*, in this case a building permit is only subject to the Impact Tax if it is issued "for development," which has a specific statutory meaning. Appellants' position is belied by the statutory definition of "development." Under the plain language of the Act, a building permit is only "for development" *if* the building activity "[i]ncreases the gross floor area of nonresidential development." County Code, § 52–47. Nonresidential "development" is statutorily defined as "building activity" that (1) "requires issuance of a building permit," and (2) "[i]ncreases ... gross floor area." By its plain text, "development" does not refer to an entire project to "develop" a piece of land. Rather, it refers to specific buildings or structures, for which permits are sought, that increase gross floor area. Although one might refer colloquially to a set of such buildings as a "development," that is not the way the term is defined in the statute. As the Court has said, "a term in a statute, when not defined in the statute itself, should be understood to be used in its commonly accepted meaning." *Williams v. Assoc. Professors of Loyola College in City of Baltimore*, 257 Md. 316, 328, 263 A.2d 5 (1970). *See also Sweet v. State*, 163 Md.App. 676, 687, 882 A.2d 296 (2005). The corollary is that when the statute does define a term, it will be accorded the specially defined meaning rather than its common meaning. *See State ex rel. Kalal v. Circuit Court for Dane County*, 271 Wis.2d 633, 681 N.W.2d

110, 124 (2004) ("specially-defined words or phrases are given their ... special definitional meaning").

Appellants urge that because their first permit enabled them to create a "building pad ... large enough to [later] construct the approved warehouse facilities, in other words, construct the contemplated gross floor area of the warehouse facilities," the first permit pertained to "development." In our view, to qualify as "development," it is not enough that the permit was one that would enable gross floor area to later be increased by further construction.

The statutory definition of "gross floor area" in County Code, § 52–47 primarily refers to the interior floor space of a building.[6] The gross floor area is measured in terms of the warehouse structures, not the square footage of the "building pads" on which they sit. Put another way, the size of the building pad does not dictate the "gross floor area of nonresidential development" that will be created, because a builder could, for example, construct a building with one story or two, and the height of the building obviously affects "gross floor area." Thus, the relevant figure is the actual square footage, dictated by the footprint and number of stories of the building, not the size of the building pad.

Under the Act, the term "development" will only apply to one building or structure at a time. Appellants clearly applied for two building permits "for development": the permits for the two warehouses constitute two different "developments," on which appellants were separately taxed. Therefore, appel-

---

6. As we noted, "gross floor area" is defined in County Code, § 52–47:

   *Gross floor area* means the sum of the gross horizontal area of the several floors of a building or structure measured from the exterior faces of the exterior walls. ... In a covered but unenclosed area, such as a set of gasoline pumps or a drive-through area, gross floor area means the covered area. Gross floor area does not include:
   
   (1) basement or attic areas with a headroom of less than 7 feet 6 inches;
   (2) areas devoted to unenclosed mechanical, heating, air conditioning, or ventilating equipment;
   (3) parking structures; or
   (4) accessory structures to a residential building.

lants' argument that the "first" building permit for development is the only taxable event, and that subsequent permits may not be taxed, misses the mark.[7]

The mechanism for collection of the tax also undercuts appellants' position. "Applicants for building permits for development ... must supply to the Department of Permitting Services for each requested building permit ... [t]he gross floor area and type of development for nonresidential development." County Code, § 52–50(b). The tax is calculated by multiplying the gross floor area by a dollar amount that varies based on the type of development. *See* County Code, §§ 52–51(a) & 52–57(a). Additionally, the tax must be paid before the permit is released. County Code, § 52–50(c). Although construction of the retaining walls enabled appellants to create a building pad that would eventually accommodate the "contemplated" gross floor area of the warehouses, the tax is calculated based on the actual area, not the contemplated area. Notably, the permit applications filed by appellants for the various retaining walls and their alterations recited a variety of square footage figures ranging from zero to 10,000, none of which approached either the "contemplated" or actual square footage of the two warehouses.

If appellants had filed their first permit application after the 2002 amendment's effective date, it would have been impossible for the County to calculate appellants' tax obligation from that application. Although appellants argue that the tax's applicability should be determined by the date that they filed their first permit application, their argument would create the untenable result that the tax would apply before the amount of the tax could be calculated. In contrast, under the County's interpretation, a permit is "for development" if it is for the construction of the actual building that contains the increased "gross floor area" which qualifies as development—a figure

---

**7.** We do not wholly discount the possibility that, under this statutory scheme, a factual situation could arise in which several building permits were filed that did, in fact, all concern the same "development." However, those facts are not before us.

that would be contained in the application for the permit for that building, but is unlikely to be contained in (or perhaps even known at the time of filing of) any other application. The County's interpretation, which we adopt, is far easier to administer than appellants', because it guarantees that the permit application that triggers the tax will also be the permit from which the tax obligation can be calculated.

Moreover, even assuming that the permit to build retaining walls for which appellants applied in June 2002 constituted a building permit "for development," the filing of that permit before the ordinance's effective date would not have exempted all subsequent permits from the Impact Tax. We explain.

Looking to the effective date of the 2002 amendment to the Impact Tax, appellants declare that it "specifically excluded 'developments' for which a building permit application was filed prior to its effective date." They make much of the phrase "*a* building permit" in the provision. (Emphasis added). Citing *Pleasants Investments Ltd. Partnership v. Dept. of Assessments and Taxation*, 141 Md.App. 481, 786 A.2d 13 (2001), for the proposition that the word "a" can mean "one" or "any," they glean from that word that the Impact Tax does not apply to a project so long as at least "one" or "any" building permit was sought before July 1, 2002.

According to the County, appellants' position is an "illogical interpretation" of the legislation. It asserts: "The words that Srour seeks to distort must be read in the context in which they appear. The combination of the definition of 'development,' the applicability of the tax, and the effective date of the amendment reflects the proper meaning of the word 'a.'" The County adds: "The provision in a bill that establishes the effective date is an integral part of the act.... And when the legislature declares the effective date of an act, it is presumed to have intended the act 'to take effect on that particular date, and no other.' *Robey v. Broersma*, 181 Md. 325, 336, 26 A.2d 820, 827 (1942)."

In *Pleasants*, 141 Md.App. at 493, 786 A.2d 13, the Court followed the parties' invitation into "a semantic whirlpool" of

debate as to the meaning of the English language's indefinite article. The Court reviewed several dictionaries and relevant cases, concluding that the word "a" can mean "one" or "any"— but, we emphasized, " *'the meaning depends on context.'* " *Id.* (quoting Black's Law Dictionary 1 (6th ed.1990); emphasis in *Pleasants* ). In the context of that case, we found "one" to be the more persuasive interpretation. *Pleasants,* 141 Md.App. at 496–97, 786 A.2d 13.

In the context of this case, however, it does not matter which definition we choose, for neither is of help to appellants. Appellants read the Act to exclude a development from taxation so long as "a building permit" was sought before July 1, 2002. But that is not what the statute does. As noted, the statute provides: "This Act takes effect on July 1, 2002, and *applies* to any development for which an application for a building permit is filed *on or after* that date." 2002 Montg. Co. Laws, ch. 4, § 2(a) (Emphasis added). Thus, it *includes* developments for which a building permit is sought *after* the effective date.

Substituting the words "one" or "any" for "a" into the effective date provision makes no difference, for neither has the meaning that appellants desire. "This Act ... applies to any development for which an application for *[one]* building permit is filed on or after [July 1, 2002]," has the same meaning as "This Act applies to any development for which an application for *[any]* building permit is filed on or after [July 1, 2002]." Appellants filed two permit applications after July 1, 2002, which triggered the Impact Tax. The meaning that appellants desire can only be achieved if "a" means "the first," as in "This Act applies to any development for which an application for *[the first]* building permit is filed on or after [July 1, 2002]," or if "a" means "every," as in "This Act applies to any development for which an application for *[every]* building permit is filed on or after [July 1, 2002]." Appellants have cited no precedent for the proposition that "a" means "every" or "the first," and we decline to adopt such a strained interpretation in this context.

## C.

██ Alternatively, appellants draw on Maryland's zoning case law to support the contention that the application for their first permit gave them a vested right "to proceed under the law as it existed at the time the application for Permit No. 1 was filed—prior to the effective date of the county-wide Development Impact Tax." The Maryland Tax Court rejected that contention, stating:

> [C]learly taxing jurisdictions have the right to change taxes on property. Property tax rates on peoples' property in the County get changed every year ... and that affects the rights of the property owner after the property is in existence. One could say that's exactly what occurred here. . . . I don't think any property owner has vested rights not to have their taxes changed. I guess, personally, if that's the case, I'd love to know about it so that my property taxes on my residence don't change every year.

Appellants maintain that the circuit court erred "when it sustained the Maryland Tax Court's finding that there are 'no vested rights in tax as there might be in zoning,' when it is the clearly articulated intent of the legislature that such rights are to vest." Claiming that "Maryland's law of vested rights should be extended to apply to the Development Impact Tax because it is clearly a 'building regulation,' " appellants assert:

> The County Council intended, through its prospective enactment of Bill No. 47–01 evidenced by the inclusion of the July 1, 2002 effective date, for those who had filed applications for a building permit for development prior to July 1, 2002, to have a vested right to obtain any further building permits required after July 1, 2002 to complete their projects without being subject to the Development Impact Tax. The language employed may be considered as "vesting" or as imposing by clear implication a "date of finality." Every tax, including a development impact tax requires a "taxable event." Here, it is clear that the intended taxable event was the application for the first building permit required for Development that was filed on

or after July 1, 2002. Any building permit application filed after the first permit for the completion of building activity commenced under the first permit was not a "taxable event." An attempt to make subsequent applications for additional permits for completion of the same Development a "taxable event" is impermissible because Bill No. 47–01, intended to vest one's right to complete a Development for which a building permit application had been previously submitted.

To support their position, appellants cite *Powell v. Calvert County*, 368 Md. 400, 795 A.2d 96 (2002). In *Powell*, the Court of Appeals explained the doctrine of vested rights in the context of zoning, as follows:

[The doctrine of vested rights] "has a constitutional foundation [and] rests upon the legal theory that when a property owner obtains a lawful building permit, commences to build in good faith, and completes substantial construction on the property, his right to complete and use that structure cannot be affected by any subsequent change of the applicable building or zoning regulations."

*Id.* at 410, 795 A.2d 96 (quoting *Prince George's County v. Sunrise Dev. Ltd. Partnership*, 330 Md. 297, 312–13, 623 A.2d 1296 (1993)).

In *Town of Sykesville v. West Shore Communications, Inc.*, 110 Md.App. 300, 677 A.2d 102 (1996), we analyzed three requirements, distilled from the passage above, that a land-owner must fulfill prior to the effective date of an ordinance, in order to obtain a vested right to an exemption from the new law. In brief, the three requirements are as follows: (1) actual physical commencement of construction, (2) undertaken in good faith, (3) pursuant to a validly issued building permit. *Town of Sykesville*, 110 Md.App. at 305, 677 A.2d 102.

There is no debate among the parties over whether appellants have acted in good faith or whether their permits were validly issued. The County suggests, however, that appellants cannot satisfy the first *Town of Sykesville* requirement, remarking that "[n]ot only were no permits issued before July 1,

2002, but no construction occurred in reliance on a valid permit" before that time. The County asserts:

> In an effort to escape the plain meaning of the statute and the consistent legislative history, Srour engages in a creative application of vested rights principles. Neither the facts of this case nor the cases relied upon by Srour support the application of vested rights principles to avoid the imposition of the development impact tax to the construction of the warehouses.

* * *

The vesting of rights serves to protect landowners from changes in zoning and building regulations after the owners have made significant improvements pursuant to a validly issued building permit. There is no indication that this principle was intended to apply to protect a property owner from the imposition of an impact tax on development where building permits are sought and development occurred after the effective date of the tax. The Tax Court properly rejected this argument.

In response, appellants contend that "[t]he provision of Maryland's law of vested rights that the commencement of construction . . . is necessary was statutorily modified by the County Council's legislatively stated intent to make the trigger of the Development Impact Tax the *filing* of a building permit application." (Emphasis in original). "Therefore," they reason, "Appellants' right to complete the contemplated development without the imposition of the Development Impact Tax on any permits applied to after the application for Permit No. 1 has vested."

We need not resolve this dispute because we are satisfied that, even if appellants had received their first permit for the retaining walls and began construction of the walls before July 1, 2002, they would still not have a vested right to an exemption from the Impact Tax. We explain.

All of the cases cited by appellants deal with vested rights in the context of zoning or building regulations. Appellants

argue that "[t]he Development Impact Tax is a building regulation because it is applied to . . . building activities and is calculated based on the amount of gross floor area constructed. . . . The additional cost of which is a regulation on building." But, the Impact Tax is not a regulation; the Court of Appeals has already held that the Impact Tax is not a regulatory fee. *Eastern Diversified, supra,* 319 Md. at 54, 570 A.2d 850 ("[T]he characteristics of the development impact fee scheme . . . are indicative of a tax rather than a regulatory fee."). As discussed earlier, *Eastern Diversified* and *Waters Landing Ltd. Partnership v. Montgomery County, supra,* 337 Md. 15, 650 A.2d 712, dealt with prior versions of this ordinance, ultimately holding that the development impact fee is an excise tax. *Id.* at 25, 650 A.2d 712 ("We conclude . . . that the [development impact] tax is an excise tax. . . .").

Moreover, unlike zoning regulations, which regulate the use to which a property may be put, the Development Impact Tax simply costs the builder money. While we do not minimize the significance of such an expense, this difference is critical in terms of the vested rights doctrine. The Washington Court of Appeals explained in a similar case involving "transportation impact fees (TIFs)":

> The TIFs do not affect the physical aspects of development (i.e. building height, setbacks, or sidewalk widths) or the type of uses allowed (i.e. residential, commercial, or industrial). If they did, then TIFs would be subject to the vested rights doctrine. In other words, "[the developer] is not being forced to use its land or build differently from that which [the developer] was able to do at the time its plans were approved. . . . . Instead, the cost is increased."

*New Castle Investments v. City of LaCenter,* 98 Wash.App. 224, 989 P.2d 569, 576 (1999) (quoting *Lincoln Shiloh Assoc. v. Mukilteo Water Dist.,* 45 Wash.App. 123, 724 P.2d 1083, 1086 (1986)).

In *New Castle Investments,* developers challenged a city's "transportation impact fees," which, like the County's Impact Tax, were "used to pay for city facilities, such as traffic

signals or a park, that may be indirectly impacted by new development." *New Castle Investments*, 989 P.2d at 571. The developers charged that the TIFs were "land use control ordinances," which would bring them within the scope of a statutory scheme for vested rights in land use. *Id.* The court rejected this notion. It distinguished TIFs on the ground that they were more like taxes than land use regulations, because their purpose was to raise revenue and they were codified with excise tax provisions, rather than with land use regulations. *Id.* at 574–75. The court also observed that the purpose of vested rights law was to "prevent a project from being obstructed by enacting new zoning ordinances or building codes." *Id.* at 573 (internal citations omitted). In its view, "[a] TIF does not limit the use of land, nor does it resemble a zoning law. Instead, a TIF merely affects the ultimate cost of the development." *Id.* "Thus," the court held, "it is not the type of right that vests under the vested rights doctrine." *Id.*

Several courts in other jurisdictions have also held that similar taxation schemes did not implicate vested rights. In *Westfield–Palos Verdes Co. v. City of Rancho Palos Verdes*, 73 Cal.App.3d 486, 141 Cal.Rptr. 36 (1977), developers who had acquired permits and commenced construction on various housing projects challenged several "bedroom taxes" enacted by the City of Rancho Palos Verdes, so called because they were taxes levied on new construction of residential dwellings on a per bedroom basis. *Id.* at 39–41. The developers argued that the taxes violated their "vested right to complete projects for which building permits and financing have been secured and where construction has been substantially completed." *Id.* at 41–42. In strong language, the court rejected their claim, explaining that "[t]he imposition of a new tax, or an increase in the rate of an old one, is simply one of the usual hazards of the business enterprise." *Id.* at 42: It added, *id.:*

Appellants' attempt to use a vested rights principle to gain immunity from unforeseen taxes is virtually without precedent, and if followed to its logical conclusions, would shield any lawful business from newly enacted municipal taxes if

that business had made any sort of irrevocable commitments, either financial or contractual, in commencing operations in that municipality.

Another California case, *Winnaman v. Cambria Community Services District*, 208 Cal.App.3d 49, 256 Cal.Rptr. 40 (1989), also provides guidance. There, the builder of a commercial park had obtained several preliminary permits, including a grading permit, and had begun grading in anticipation of construction on the property. *Id.* at 41. Meanwhile, the municipal water and sewer authority changed by ordinance its method of calculating service fees, from a flat fee to a fee based on square footage. *Id.* The ordinance provided that it would apply to any development that had not received all of its permits by the effective date of the ordinance. *Id.* The developer applied for his building permits shortly after the effective date. *Id.* He challenged the authority's imposition of the new fees, which were approximately six times higher for him than the flat rate fees, asserting that he had a vested right to the former fee scale. *Id.* Rejecting his claim, the court stated: "[A] connection fee is in the nature of an excise tax, and the vested rights doctrine does not shield a developer from unforeseen tax increases." *Id.* at 44 (internal citation omitted).

Similarly, in *City of Key West v. R.L.J.S. Corp.*, 537 So.2d 641 (Fla.App.1989), the court rejected a developer's vested rights argument against newly enacted "impact fees" designed to "allocate to new residents of the City a fair share of the cost of new public facilities." *Id.* at 642 (internal citations omitted). The court determined that the fact that the developer had received a building permit did not give him a vested right, reasoning that "a building permit, although assuring its possessor that he may safely rely on it and build in accordance with the approved plans, provides no assurance to the possessor that a taxing authority of the very same government will not increase taxes on the property being built upon. . . ." *Id.* at 646.

Speaking more generally, the Supreme Court appears to hold the same view. It has said that "[t]ax legislation is not a promise, and a taxpayer has no vested right in the Internal Revenue Code.... [A] taxpayer 'should be regarded as taking his chances of any increase in the tax burden which might result from carrying out the established policy of taxation.'" *United States v. Carlton,* 512 U.S. 26, 33–34, 114 S.Ct. 2018, 129 L.Ed.2d 22 (1994) (quoting *Milliken v. United States,* 283 U.S. 15, 23, 51 S.Ct. 324, 75 L.Ed. 809 (1931)).

In sum, in *Eastern Diversified,* 319 Md. at 55, 570 A.2d 850, the Court of Appeals held that the Development Impact Tax is a tax and not a zoning regulation, because its "primary and predominant purpose ... is to raise revenue, regardless of what incidental regulatory effect the imposition of the fees may have on development within the county." The Impact Tax merely requires appellants to pay money rather than restricting the use to which they can put their property. Therefore, the vested rights doctrine is inapplicable.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANTS.**