964 A.2d 650

**F.D.R. SROUR PARTNERSHIP, et al.**

v.

**MONTGOMERY COUNTY, Maryland.**

**No. 47 Sept.Term., 2008.**

Court of Appeals of Maryland.

Feb. 9, 2009.

Stephen J. Orens (Casey L. Moore of Miles & Stockbridge, P.C., Rockville), on brief, for Petitioners.

Scott R. Foncannon, Associate County Atty. (Leon Rodriguez, County Atty., and Karen L. Federman Henry, Div. Chief, Rockville), on brief, for respondent.

ARGUED BEFORE BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, JOHN C. ELDRIDGE, (Retired, Specially Assigned) and IRMA S. RAKER, (Retired, Specially Assigned), JJ.

HARRELL, Judge.

This case challenges a final decision of the Maryland Tax Court upholding an assessment of Montgomery County's Development Impact Tax ("Impact Tax") in the approximate amount of $300,000 for transportation improvements in connection with two warehouse building permits applied for by and issued to F.D.R. Srour Partnership and Robert Srour ("Petitioners"). The Tax Court rejected Petitioners' contention that the building permits are exempt from the Impact Tax because the development project, viewed as a whole, was initiated before the effective date of the amended Impact Tax ordinance applied in this instance. Petitioners sought judicial review in the Circuit Court for Montgomery County of the Tax Court's ruling. The Circuit Court affirmed. The Court of Special Appeals, on direct appeal, affirmed in a reported opinion. *F.D.R. Srour P'ship v. Montgomery County*, 179 Md.App. 109, 944 A.2d 1149 (2008). We granted a writ of certiorari upon Petitioners' petition. *Srour v. Montgomery County*, 405 Md. 290, 950 A.2d 828 (Table) (2008). For the reasons that follow, we shall make it unanimous.

I.

In 2002, Montgomery County decided to amend its preexisting, but geographically limited, development impact tax structure by enacting Chapter 4 of the Montgomery County Laws of 2002, the County's "Development Impact Tax for Transportation Improvements," codified at Montgomery County Code ("County Code"), § 52–47 *et seq.* (2004). The Impact Tax is a tax on "development," which is defined specifically in County Code § 52–47 as

the carrying out of any building activity or the making of any material change in the use of any structure or land which requires issuance of a building permit and:

(1) Increases the number of dwelling units; or

(2) Increases the gross floor area of nonresidential development.

The purpose of the Impact Tax, which is calculated and assessed when a developer submits a building permit application, County Code, § 52–51, and then collected before the issuance of the permit, County Code § 52–50(c), is to help "fund a program of transportation improvements through development impact taxes to allow new growth in the County" and "[to] require[ ] new development to pay its pro rata share of the costs of impact transportation improvements necessitated by that development." County Code, §§ 52–48(c), (d). Before the County enacted the 2002 amendment with which we primarily are concerned in the present case, the Impact Tax applied only within select geographical areas within the County, which did not include where Petitioners' property is situated. The 2002 amendment was intended to apply the Impact Tax structure throughout the County, i.e., "[the Tax] applies to any development for which an application for a building permit is filed on or after [1 July 2002]." 2002 Laws of Montgomery County, Ch. 4, sec. 2(a).

Turning back the clock to 1988, Petitioners acquired an undeveloped parcel of industrially-zoned real property located just outside the city limits of Rockville, in a subdivision known as Burgundy Park (the "Property").[1] They ultimately planned to build two warehouses on the Property ("Building A" and "Building B"). Mr. Srour, a licensed Professional Engineer, was the "chief designer" of the improvements proposed to be constructed on the Property. Petitioners struggled to design a warehouse development that would accommodate the somewhat disparate split-zoning (I–2 and I–4) standards applicable to the Property and that could overcome the Property's unique physical characteristics. In particular, steep topogra-

---

1. Petitioners specifically identified the Property in their Petition of Appeal to the Maryland Tax Court:

 The Subject Property is a Record Lot that was created by plat in 1993 as "Lot 24, Block B, Burgundy Park Subdivision." Plat 19003 was recorded on April 22, 1993 and vested Preliminary Plan No. 1–88333, which was approved on April 16, 1990 by the Montgomery County Planning Board. The Subject Property is presently identified as Lot 26, Block B, Burgundy Park, in accordance with a confirmatory plat, Plat No. 22856 that was recorded on May 6, 2004.

phy, as well as a forest conservation easement established on the eastern side, presented considerable obstacles. The street-level access of the Property at Southlawn Lane was at an elevation of 372 feet, the southern boundary of the Property at an elevation of 444 feet, and along its eastern edge the elevation fell below 360 feet. At certain places, the grade on the Property was as steep as 25%. A grading and development design was settled on finally, upon which Petitioners were prepared to move forward with their plans for the construction of the warehouses.

On 6 June 2002, some twenty-five days before the 1 July 2002 effective date of the amended Impact Tax, Petitioners filed with the County Department of Permitting Services ("Department") a building permit application, No. 279528 ("Permit 1"), accompanied by a plan view indicating conceptually the two warehouse buildings to be constructed, but not seeking permission to construct them at the time.[2] Permit No. 1 was issued by the Department on 1 December 2003. Subsequently, Permit No. 1 was revised and another application, No. 326449, submitted on 1 December 2003 ("Permit 2"). Permit 2 was issued on 23 January 2004. Permits 1 and 2 together sought authorization to construct three reinforced concrete retaining walls and two Gabion Walls on the Property. No assessment or demand for payment of the amended Impact Tax was made by the Department upon the issuance of either Permit 1 or 2.

Two of the retaining walls covered by Permit 1 ("Wall 1" and "Wall 2") were to be located on the western side of the Property, adjacent to the ultimate driveway that would provide the only access to the Property from Southlawn Lane. Wall 2, 32 feet in height and 350 feet in length, was to be incorporated in the structural base of the future warehouse Building A. That wall stabilized the building pad enabling Petitioners ultimately to "get a [building] pad large enough to build these buildings and the entrance to it." The third

---

2. A sediment control permit application also was filed with the Department in November 2003.

retaining wall ("Wall 3"), located on the eastern side of the Property, was the first wall constructed pursuant to Permits 1 and 2 and also was to be attached to Building A. Construction on Wall 3 commenced in January 2004. Walls 2 and 3 are essential to support structurally the proposed gross floor area of proposed Building A.

The two Gabion Walls, comprised of "basketball" size rocks inserted in a metal cage or frame, also were to be located on the western side of the Property. One of these walls is situated along the western boundary of the Property, adjacent to Southlawn Lane, and the other is sited along a stormwater management pond.

According to Petitioners, the five walls (Walls 1–3 and the two Gabion Walls) were all essential elements of the ultimately-completed industrial buildings because they were needed to stabilize the soil on the site after the grading of the steep topography to accommodate the building pads, the vehicular access to Southlawn Lane, and the stormwater pond. Petitioners urge that, without these improvements, the Property would remain generally "undevelopable."

Subsequent to the construction of the walls, Petitioners submitted another building permit application, No. 338122, on 23 March 2004 for the final retaining wall structure needed to enable construction of the warehouse buildings ("Permit 3"). That retaining wall, according to Petitioners, also was a required structural element of the warehouse structures. The permit was issued on 16 June 2004, and the construction was completed. No development Impact Tax was assessed by the Department for the improvements covered by Permit 3.

On 27 July 2004, Petitioners' architect, Steven's Architects, filed applications for the last two permits needed to construct the warehouses on the Property, No. 352990 ("Permit 4") and No. 352996 ("Permit 5"). Permit 4 was for construction of Building A, an enclosed building of 38,374 square feet, and Permit 5 for Building B, with a building area of 79,875 square feet.

In June 2005, prior to the issuance of Permits 4 and 5, the Department informed Petitioners that an Impact Tax payment would be required before the issuance of the permits. The Department calculated, under the formula in the County Code, that Permit 4 required an Impact Tax payment of $95,935 and Permit 5 required a payment of $199,687.50, for a total of $295,622.50.

Petitioners contested the Department's determination and assessment of the Impact Tax, and asked its Director to reconsider. In lieu of paying the assessed amounts, and pending the Director's review, Petitioners posted a letter of credit pursuant to County Code § 52–56. The Department issued Permits 4 and 5. Petitioners commenced construction of the warehouses, pursuant to the permits, and the development since has been completed while this case winded its way through the administrative and judicial review processes.

The Director found against Petitioners. His written deter-mination stated that "a permit for a retaining wall [Permits 1, 2, and 3] does not serve to exempt subsequent development [Permits 4 and 5] from the tax," and that, therefore, "it is this Department's determination that the impact tax is due and payable."

Pursuant to County Code § 52–56 and Md.Code, Tax–General Article § 3–103 (2004 Repl.Vol. & Supp.2008), Peti-tioners, on 14 September 2005, filed an appeal with the Maryland Tax Court challenging the Director's determination. Petitioners and the County stipulated as to most of the relevant facts, and the Tax Court heard the testimony of Mr. Srour. At the close of the administrative hearing, on 22 February 2006, the Tax Court orally ruled in favor of the County. In pertinent part, the Tax Court found:

We'll start with the tax issue. It doesn't appear to me that there is the same vested rights in tax cases as there might be in zoning. That clearly taxing jurisdictions have the right to change taxes on property. Property tax rates on peoples' property in the County get changed every year, or potentially can be whenever they change the tax rate and

that affects the rights of the property owner after the property is in existence. One could say that's exactly what occurred here. . . . That being the case, the arguments for vesting, I don't think really apply in this matter.

Which brings us to an interpretation of [the transition provision providing the effective date of the amendment]. This Act takes effect on July 1 st, 2002, and applies to any development for which an application for a building permit is filed on or after that date. . . .

[T]he building permits that were approved, or at least applied for prior to that date, had no square feet. They were all walls. And that the County didn't try to collect the tax until there was a building permit that related to a structure that had some sort of square feet, and then they could calculate the tax. . . . So I think in every instance what they're looking to are building permits that increase the number of square feet. And any project where there is a permit applied after July 1, '02 that increases the square feet that would then fall within the taxing jurisdiction of this statute.

The facts of this matter, the first time a permit was applied for for a structure of any sort that included square feet was well after the effective date of July 1 st, 2002. And it was agreed that the amount of tax that was charged wasn't an issue. The only question was whether or not this property was subject to this statute, and it's my determination that, in fact, it was.

A written Order memorializing the County's victory was entered by the Tax Court on 4 April 2006.

Thereafter, pursuant to Md.Code, Tax–General § 13–532 and State Government Article § 10–222 (2004 Repl.Vol. & Supp.2008), Petitioners, on 7 April 2006, filed in the Circuit Court a Petition for Judicial Review. The Circuit Court, on 21 September 2006, ruling from the bench, stated, in part:

I guess, the bottom line is, [Petitioners] just haven't convinced me. . . . [Y]ou're saying "building activity" meant the retaining walls, which went with the building, and

therefore everyone slides in under the tag. . . . And you're saying it vested at that point. . . . And I just disagree with you [and agree with the Tax Court's determination].

I think it's a strange construction of . . . the Act. Because they're talking about a broader meaning of "development" than simply filing a permit to get your footings in, or your retaining wall in, or anything else. And I think that's where we disagree.

On 18 October 2006, the Circuit Court issued a written Order affirming the judgment of the Tax Court.

Petitioners pursued an appeal in the Court of Special Appeals, pressing two main arguments. First, they posited that Permit 1, filed before the effective date of the amended Impact Tax, enabled them to establish a "building pad" large enough to construct the contemplated warehouse facilities. The "building pad," commenced pursuant to Permit 1, made it feasible for the eventual construction of the warehouses, given the Property's challenging topographical characteristics. Therefore, Petitioners urged, Permit 1 fit the County Code's definition of "development" because Permit 1 "permitted [Petitioners] to construct the gross floor area of the warehouse facilities" (citing *Pemberton v. Montgomery County*, 275 Md. 363, 340 A.2d 240 (1975)). Having filed for Permit 1 before the effective date of the territorily-broadened Impact Tax, and given the "clearly articulated legislative intent of the County Council, stated in the Bill itself, . . . not to apply the new tax to developments that were underway when the new tax became effective," Petitioners argued that, therefore, all of the subsequent Permits were exempt from the tax. Second, they argued that, by establishing 1 July 2002 as the effective date of the amendment, the County Council intended for those who had filed before then applications for "a building permit for development" to "have a vested right to obtain any further building permits required after July 1, 2002 to complete their projects without being subject to the Development Impact Tax."

The intermediate appellate court, in *F.D.R. Srour P'ship v. Montgomery County*, 179 Md.App. 109, 944 A.2d 1149 (2008), concluded that Petitioners' Permits 4 and 5 were not exempt under the transitional effective date provision of the 2002 amendment to the Impact Tax ordinance because those permits were filed after the effective date, and because the object of the earlier permits, Permits 1 through 3, did not satisfy the local legislative definition of "development." The court rejected Petitioners' argument under *Pemberton v. Montgomery County*, 275 Md. 363, 340 A.2d 240 (1975), finding that Permits 1 through 3 did not satisfy the statutory definition of "development" because, although the structures proposed to be constructed thereunder stabilized sufficiently the problematic topography of the Property, it was not until Permits 4 and 5 were filed that the gross floor area of the warehouses was fixed with certainty, such that, therefore, the respective Impact Taxes could be calculated and assessed. The intermediate appellate court also rejected Petitioners' contention that the imposition of the Impact Tax in connection with the warehouses constructed pursuant to Permits 4 and 5 interfered with vested rights. The court deemed the vested rights doctrine inapplicable in the context of revenue-raising legislation, as opposed to more regulatory-oriented legislation such as a zoning regulation.

## II.

### A.

Despite its name, the Maryland Tax Court actually is an administrative agency of the State. *See* Md.Code, Tax–General § 3–102. When reviewing its decisions, we review the decision directly, the reviews by any intervening courts notwithstanding. *Comptroller of Treasury v. Sci. Applications Int'l Corp.*, 405 Md. 185, 192, 950 A.2d 766, 770 (2008); *Comptroller of Treasury v. Phillips*, 384 Md. 583, 590, 865 A.2d 590, 594 (2005). A decision of the Tax Court will be affirmed unless that decision is not supported by substantial evidence appearing in the record or is erroneous as a matter

of law. *Comptroller of Treasury v. Blanton*, 390 Md. 528, 535, 890 A.2d 279, 283 (2006). We further have noted that "[e]ven with regard to some legal issues, a degree of deference should often be accorded the position of the administrative agency. Thus, an administrative agency's interpretation and application of the statute which the agency administers should ordinarily be given considerable weight by reviewing courts." *Blanton*, 390 Md. at 534, 890 A.2d at 283 (citing *Lussier v. Md. Racing Comm'n*, 343 Md. 681, 696–97, 684 A.2d 804, 811–12 (1996); *McCullough v. Wittner*, 314 Md. 602, 612, 552 A.2d 881, 886 (1989)). The Tax Court's decision, however, will be overturned if it was based on a material error of law. *State Dep't of Assessments & Taxation v. Consolidation Coal Sales Co.*, 382 Md. 439, 455, 855 A.2d 1197, 1207 (2004).

B.

█ As noted previously, in 2002 the County Council for Montgomery County broadened the County's pre-existing Impact Tax provisions to phase-in its application to certain construction and development county-wide. 2002 Laws of Montgomery County, Ch. 4, sec. 2(a) provides that "[t]his Act takes effect on July 1, 2002, and applies to any development for which an application for a building permit is filed on or after that date." "Development" is defined in § 52–47 of the County Code, in both grammar and sentence structure, as follows:

> *Development* means the carrying out of any building activity or the making of any material change in the use of any structure or land which requires the issuance of a building permit and:
>
> (1) Increases the number of dwelling units; or
>
> (2) Increases the gross floor area of nonresidential development.

The principal dispute between the parties in the present case is over the interpretation of the definition of "development," and how that interpretation applies under the statutory transitional phase-in provision.

■■■ Before launching into our analysis of the amended Impact Tax ordinance, we rightfully pause to reflect on the principles of statutory construction that both guide and constrain our analysis. Our review of local laws and ordinances is governed by the same principles as our review of State statutes. *O'Connor v. Balt. County*, 382 Md. 102, 113, 854 A.2d 1191, 1198 (2004) (citing *Howard Research & Dev. Corp. v. Concerned Citizens for Columbia Concept*, 297 Md. 357, 364, 466 A.2d 31, 34 (1983)). The cardinal rule of construction is to ascertain and effectuate the actual intent of those who enacted or adopted the law or ordinance. *Bd. of Supervisors of Elections v. Goodsell*, 284 Md. 279, 284, 396 A.2d 1033, 1035–36 (1979). In divining this intent, a court must read the language of the law or ordinance in context and in relation to all of its provisions, and, additionally, must consider its purpose. *Dep't of State Planning v. Mayor of Hagerstown*, 288 Md. 9, 14, 415 A.2d 296, 299 (1980). Where legislative language is unambiguous, and expresses a definite meaning consonant with the ordinance's purpose, courts must not delete or insert words to make the statute express an intention different from its clear meaning. *In re James S.*, 286 Md. 702, 705, 410 A.2d 586, 587 (1980). Further, if no definition is supplied for a specific term employed in the ordinance, the court "will give that term its ordinary and natural meaning and will not resort to subtle or forced interpretations for the purpose of extending or limiting the operation of the statute." *Md.-Nat'l Capital Park & Planning Comm'n v. State Dep't of Assessments & Taxation*, 110 Md.App. 677, 689, 678 A.2d 602, 607 (1996), *aff'd*, 348 Md. 2, 702 A.2d 690 (1997).

Petitioners' flagship argument before this Court focuses entirely on the first two clauses of the legislative definition of "development," and not, as in the intermediate appellate court, on the second sub-set of the definition related to increasing gross floor area. Citing the apparent intention on the part of the County Council to phase in the amended Impact Tax as to development projects already underway, Petitioners make much of the "or" at the end of the first phrase in the definition of "development." They argue:

In the case at bar, neither of the lower courts nor the Maryland Tax Court correctly discerned the legislative purpose of the transitional provisions of the legislation and compounded that error by failing to apply the statutory definition of the word "development" that the County Council itself had enacted as an express provision of the Impact Tax, before expanding that tax to county-wide application. The use of the word "development" in the transition provision of the legislation was purposeful. The enacted definition of the word "development" has two separate and distinct components separated by the word "or." By ignoring the word "or," the lower courts relegated the first clause of the definition of "development," defining it as "the carrying out of any building activity," to meaningless surplusage. This Court needs only to read Council Bill 47–01 as a whole to conclude that the decision of the lower appellate court renders the first clause of the definition of "development" "surplusage, superfluous, meaningless and nugatory."

(citations omitted). Thus, Petitioners posit that by inserting "or" after the initial phrase, "the carrying out of any building activity," the County Council "clearly intended" that the definition of "development" be interpreted schematically as:

*Development* means the carrying out of any building activity [STOP];

OR the making of any material change in the use of any structure or land which requires the issuance of a building permit and:

(1) Increases the number of dwelling units; or

(2) Increases the gross floor area of nonresidential development.

(emphasis added). Petitioners assert that the construction activities proposed by Permit 1, the application for which was filed prior to the legislation's 1 July 2002 effective date, constitute "building activities" because the eventual "construction [of the] retaining walls ... [pursuant to the issued permits] is undeniably the 'carrying out of building activity.' "

The County rejoins that Petitioners' interpretation of "development" errs by manipulating the punctuation and format

of the actual form of the language set forth in the ordinance, thus yielding an inconsistent interpretation and distorting the meaning of the term as defined. Had the County Council intended Petitioners' dichotomous interpretation of the "or" at the end of the first clause, as the argument goes, the Council would have made clearer the punctuation and structure to that effect. Further, the County argues that Petitioners' interpretation is inconsistent with the county-wide, revenue-raising intention of the 2002 amendment. The County would have us conclude that the amended Impact Tax is applicable to Petitioners' Permits 4 and 5 because the applications for these Permits were filed after the 1 July 2002 effective date and the activities proposed there satisfy the definition of "development" because the construction of the warehouses constitutes "the carrying out of any building activity . . . which requires issuance of a building permit and . . . [i]ncreases the gross floor area of nonresidential development."

## C.

Petitioners' position strikes us as tenuous, at best. In order for us to agree with them, we would have to accept a number of premises, none of which are apparent from a fair reading of the County ordinance.

First, we would have to embrace the premise that the County Council intended the "or" following the phrase "the carrying out of any building activity" to function as an absolute break in sense with the balance of the definition and render the later phrases, "[i]ncreases the number of dwelling units" or "[i]ncreases the gross floor area of nonresidential development," as modifying only the phrase "the making of any material change in the use of any structure or land which requires issuance of a building permit." Second, we would have to accept the premise that "building activity," a term not defined in the ordinance, was intended to have an independent and determinative meaning despite the relatively specific and controlling definition, and subsequent implementation under the transition provision in the tax structure, of the term "development."

Third, we would have to accept the additional premise that the improvements proposed in the application for Petitioners' Permit 1 constituted sufficient, under the interpretation they urge, "building activity" sought before the 1 July 2002 effective date. Petitioners concede that the only relevant "activity" that was accomplished before 1 July 2002 was the filing of the application for Permit 1. The record reveals that actual construction of any kind, even including the retaining walls, was not commenced earlier than January of 2004. Nevertheless, Petitioners urge that "Permit No. 1 and the remaining permits for the retaining walls and Gabion Walls were part of an unbroken chain of seven[3] permit applications" that "were filed for the purpose of *carrying out sequential building activities.*" (emphasis in original). Thus, Petitioners contend all of the Permits and their respective construction should be considered as one continuous "carrying out of any building activity." Because such "activity" constitutes "development," under Petitioners' interpretation, and because the commencement of that "development" process preceded 1 July 2002, the entire stream of "activity" should be exempt from the Impact Tax.

Petitioners' position is undermined, first and foremost, by the manner in which the Impact Tax is to be calculated and assessed on construction projects, both before and after the 2002 amendment. Under the legislation, "[a]pplicants for building permits for development . . . must supply to the Department of Permitting Services for *each requested building permit* . . . [t]he gross floor area and type of development for nonresidential development." [4] County Code, § 52–50(b) (emphasis added). The Department, in turn, "must not issue

---

**3.** This apparently is meant to be understood as Permits 1 through 5, the amendment to Permit 1 (*see supra* at 238–39), and the sediment control permit.

**4.** "Gross floor area" is defined in § 52–47:

Gross floor area means the sum of the gross horizontal area of the several floors of a building or structure measured from the exterior

a building permit for development ... unless ... the applicant has paid the applicable development impact tax." County Code, § 52–50(c). The Impact Tax for each requested, non-residential building permit is calculated by "determining the applicable tax district," "verifying the ... gross floor area and type of nonresidential development for which each building permit is sought," and "multiplying the applicable tax by ... the gross floor area of nonresidential development." [5] County Code, § 52–51. In § 52–57, the tax rates (either per dwelling unit or per square foot) for each respective building type are supplied.

The interpretation of "development" that Petitioners' urge upon this Court is inconsistent with the statutory scheme. From the means by which the County Council chose to implement the Impact Tax, it seems to us evident that the intention of the Council was to calculate and assess the

---

faces of the exterior walls or from the center line of party walls. In a covered but unenclosed area, such as a set of gasoline pumps or a drive-through area, gross floor area means the covered area. Gross floor area does not include:

 (1) basement or attic areas with a headroom of less than 7 feet 6 inches;

 (2) areas devoted to unenclosed mechanical, heating, air condition-ing, or ventilating equipment;

 (3) parking structures; or

 (4) accessory structures to a residential building.

**5.** "Nonresidential" is defined in § 52–47:

*Nonresidential* means the use of a building that is not a residential use and includes:

 (1) offices, including general, medical, office parks, research parks, townhouse office buildings, government offices, and other similar uses;

 (2) industrial uses, including truck terminals, warehouses, light or heavy industrial and manufacturing, industrial parks, and other similar uses;

 (3) retail uses, including stores or shopping centers engaging in the sale of goods, restaurants, vehicle sales or service, banks or savings and loan institutions, theaters, post offices and other similar uses;

 (4) places of worship;

 (5) private elementary, secondary, or post-secondary schools; and

 (6) other nonresidential uses, including hotels, motels, day care centers, nursing homes, recreational facilities, and other public facilities and uses[.]

respective Impact Tax for every *single* building based upon the exact number of dwelling units (for residential buildings) or amount of square footage (for nonresidential buildings) indicated in each building's permit application. *See* County Code, § 52–51(a) ("The Department of Permitting Services must calculate the amount of the applicable development impact tax due for *each building permit* by ....") (emphasis added). The entire purpose of enacting the Impact Tax (and enlarging its geographic sweep) was "[to raise] funds to build improvements in a timely manner" by "requir[ing] new development to pay its pro rata share of the costs of impact transportation improvements necessitated by that development in conjunction with other public funds." County Code, § 52–48(d). Thus, it would be illogical and inconsistent to attribute to the County Council, as Petitioners' urge, an intent that applying for any sort of general "building activity" prior to 1 July 2002 exempts from the Impact Tax any and all subsequent building permit applications, and their respective buildings, related to that initial "activity." Such an interpretation would contradict directly the statutory scheme's attempt at establishing, for all building permit applications filed on or after 1 July 2002, a relationship between the size and intended use of buildings and the estimated pro rata costs for the transportation improvements to support those buildings.[6]

Petitioners' position is untenable further because application of their position would lead to an unintended result. Petition-

---

**6.** The County Council imposed differing rates for nonresidential land uses. The rates supplied in 2002 Laws of Montgomery County, Ch. 4, sec. 1 were as follows: on the lowest end of the spectrum are "Hospitals" and "Bioscience facilities," which pay no Impact Tax. County Code, § 52–57 (Table). In the middle ground are "Places of worship," "Private elementary and secondary schools," "Industrial," and "Office," which are to pay an Impact Tax of $0.20 to $0.32 per square foot, $0.30 to $0.53 per square foot, $1 per square foot, and $1.50 to $2 per square foot, respectively, depending on the location in the County of the building. County Code, § 52–57 (Table). At the higher end of the spectrum are "Retail" and "Other nonresidential," which are to pay $1.50 to $5.61 per square foot and $1 to $6.20 per square foot, respectively, depending on the location in the County of the building. County Code, § 52–57 (Table).

ers argue that the first "or" in the definition of "development" was intended to separate the rest of the definition from the first phrase, such that a stand-alone meaning of "development" is "the carrying out of any building activity." As has been noted, the transition provision provides that the legislation "applies to any development for which an application for a building permit is filed on or after that date." 2002 Laws of Montgomery County, Ch. 4, sec. 2(a). If we were to embrace Petitioners' position, the Impact Tax would be applicable to any "building activity" for which a building permit was filed on or after 1 July 2002, without taking into account the demand upon transportation infrastructure, if any, that new construction would have in the County.

Our reading of the ordinance persuades us that this is not what was intended by the County Council. As the County aptly notes to us, the Council intended that a minimum level of building activity occur before the tax is triggered. That minimum level of any building activity is provided in the two conditions, related to the issuance of a building permit, which the Department must find before the Impact Tax may be imposed: either an increase in the number of dwelling units (residential), or an increase in the gross floor area of nonresidential development (nonresidential). County Code, § 52–47. Because both of these conditions fundamentally engage the purpose of the Impact Tax—the extent to which the building identified in the permit application will affect the demand upon transportation infrastructure in the County—we reject Petitioners' contention and are persuaded that the conditions apply to "the carrying out of any building activity [which requires issuance of a building permit]" or "the making of any material change in the use of any structure or land which requires issuance of a building permit." County Code, § 52–47.

Petitioners' interpretation of the first "or" in the definition of "development" as indicating that the Council intended to exclude from the Impact Tax those developments and projects for which any building activities were applied for prior to 1 July 2002 is further undermined by the fact that the Council

included two specific transitional phase-ins in subsections (b) and (c) of sec. 2 of the Act. The entire 2002 Laws of Montgomery County, Ch. 4, sec. 2 states:

> (a) This Act takes effect on July 1, 2002, and applies to any development for which an application for a building permit is filed on or after that date.
>
> (b) Each taxpayer in the County District must pay the development impact tax at 25% of the rates set in Section 52–57, as amended by Section 1 of this Act, for building permit applications filed between July 1, 2002 and December 31, 2002; 50% of the rates set in Section 52–57 for building permit applications filed between January 1, 2003, and June 30, 2003; 75% of the rates set in Section 52–57 for building permit applications filed between July 1, 2003 and December 31, 2003; and 100% of the rates set in Section 52–57 for building permit applications filed on or after January 1, 2004. To the extent that any taxpayer pays a lower rate than that set in Section 52–57 because this subsection applies, any credit claimed under Section 52–55 must be reduced by the same ratio.
>
> (c) In the County District, the development impact tax does not apply to any building if:
>
> > (1) a subdivision plan, project plan, or an equivalent development approval mechanism in Gaithersburg or Rockville, which includes that building was approved before July 1, 2002, and
> >
> > (2) a building permit is issued before July 1, 2003.[7]

In light of these specific phase-in provisions, we reject Petitioners' assertion that the language in the definition of "development" and its application under sec. 2(a) should be interpreted as a phase-in provision of its own.

 We conclude that the definition of "development" in County Code § 52–47 is to be interpreted properly as follows: Development means (1) the carrying out of any building

---

7. Section 2(c) is of no help to Petitioners because Permit 1 was not issued until 1 December 2003.

activity or the making of any material change in the use of any structure or land (2) which requires issuance of a building permit and (3) increases the number of dwelling units or increases the gross floor area of nonresidential development. That definition applies to any nonresidential building for which the building permit application was filed on or after 1 July 2002. The Department acted consistently under this interpretation of the definition of "development," and the application of that definition under the transition provision of the 2002 amendment, in finding that Petitioners' proposed construction of two warehouses (Permits 4 and 5) was building activity that required issuance of building permits, increased the gross floor area of nonresidential development, and was pursuant to building permit applications filed after 1 July 2002. Thus, the Maryland Tax Court's rejection of Petitioners' challenge to the Department's determination was not erroneous.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; COSTS TO BE PAID BY PETITIONERS.**